HEARD NOVEMBER TERM, 1873.

## Columbia Water Power Company *vs.* Columbia.

A contracted with the City of Columbia to build, within two years, certain specified new water works, having sufficient capacity to force 1,500,000 gallons of water daily into the distributing reservoir of the city; to furnish sufficient water power to force into the distributing reservoir the number of gallons of water required by the city daily; to operate the works at his own expense for twenty years, and, at the expiration of that period to turn them over to the city; and, in consideration thereof, the city agreed to pay to A $16,000 per annum, during the twenty years, and to appropriate to such payment all the water rents collected by the city. A assigned the contract to B, and B having completed the works and furnished the water power, the city refused to allow him to supply its distributing reservoir with water, and to perform the contract on its part: *Held*, That B was entitled to relief in the nature of specific performance to compel the city to perform its part of the contract.

To the general rule that contracts relating to personal rights will not be specifically enforced, there are well established exceptions, and this case comes within the principle of one of those exceptions.

There was sufficient mutuality in the contract, in the equity sense of the term, to enable B to maintain the action, and the character of mutuality was not destroyed by the assignment.

The contract was assignable so as to enable the assignee to maintain an action in equity to enforce its provisions.

The contract was not performed by B within the two years fixed by its terms: *Held*, That B was not deprived thereby of his right of action, time not being of the essence of the contract.

Before CARPENTER, J., at Columbia, July Term, 1873.

This was an action by the Columbia Water Power Company, a body corporate, against the city of Columbia. It was founded upon a contract, under seal made August 23d, 1870, between the city of Columbia, of the first part, and Samuel A. Pearce, Jr., "both for

himself, and as trustee of William Sprague, of the State of Rhode Island, their heirs, executors and assigns, of the second part," the terms of which are as follows :

"That the said party of the second part covenants and agrees to and with the said party of the first part, to build such parts of a new water works as are required to force one and a half millions of gallons of water daily into the distributing reservoir now used by the said city, namely : To construct a new reservoir, near the Columbia Canal, for the purpose of collecting water from streams below the present receiving reservoir ; to erect a building for the protection of the pumps and machinery ; to lay a suction pipe from the pumps to Broad River, to be used to obtain water therefrom, should the other streams fail to furnish a sufficient supply ; to furnish a filtering apparatus for purifying the water from said river, if such water should be required ; to furnish sufficient water power to force into the distributing reservoir the number of gallons of water required by the city daily ; said works to be completed within two years from the date of the signing of this contract ; and all the labor and management of the machinery and appurtenances thereto to be furnished by the party of the second part.

"And the said party of the first part covenants and agrees to pay unto the said party of the second part, in consideration of his performance of his above named agreement, the sum of sixteen thousand dollars, annually, in good and lawful money of the United States, in equal quarterly payments ; and the said party of the second part shall give the said party of the first part ten days' notice, in writing, of the time in which he will furnish the city with its supply of water, under the terms of this contract. The day which such notice designates shall be the one from which the first quarterly payment shall date, and the subsequent payment shall be made quarterly each year until the expiration of this contract.

"This contract shall extend for the period of twenty years, and upon the expiration thereof, the reservoirs, pipes, pumps, buildings, machinery, and all and every other matter or thing in any way appertaining to the said water works, which shall have been built or furnished by the said party of the second part, shall revert to and vest as the property of the same in the party of the first part, and shall be turned over by the party of the second part at that time to the said party of the first part in good order and repair.

"At the expiration of this contract the said party of the first part shall have the privilege of leasing from the said party of the second a sufficient water power, at the same point or place used by the party of the second part for supplying water under this contract, to force into the said distributing reservoir of the said city the daily supply of water required for use by the party of the first part, at such a price and upon such terms as shall be agreed upon by three disinterested persons, one to be selected by the said party of the first part, one by the said party of the second part, and the third by the two thus chosen; and the basis upon which such price and such terms shall be fixed by the three persons thus selected shall be the number of gallons required to be forced daily into the distributing reservoir of the said city; and should a larger supply of water at any time be required than is herein specified, then additional machinery and water power are to be furnished by the said party of the second part at a price proportionate to that named in this contract.

"Should the capacity of the distributing reservoir now in use by the said city be found at any time insufficient to contain the daily quantity of water required by the said city, then it shall be obligatory on the said city to so enlarge the capacity of the said distributing reservoir as to render it capable of holding the daily supply at any time demanded.

"And it is further agreed between the parties of the first and second part that the steam engine and all the apparatus now used by the said city for forcing water into the distributing reservoir be and remain in the place and condition it now is in for the period of two years from the time when the party of the second part begins to supply the city with water, as above specified, subject to the use of the party of the second part, at his expense, should any accident or unforeseen event occur which would temporarily render his machinery inoperative.

"In order, in part at least, to secure the prompt payment of the above named consideration as it becomes due, the City Clerk or Treasurer is hereby authorized and required to pay over to the said party of the second part all water rents collected by the said city, or so much thereof as may be necessary to meet such payment. The taxes and water rents to be assessed and fixed by the party of the first part; and the said party of the first part hereby binds itself to make the rate of such taxation sufficient to raise an amount of money at least equal to the yearly compensation herein specified.

" And for the true and faithful performance of all and every of the covenants above mentioned the parties to these presents bind themselves, each unto the other, in the following penalties, to wit:

" Should the said party of the second part fail to comply with the terms of this contract, he shall be bound in the penal sum of ten thousand dollars, to be paid over to the said city within ninety days from the date of such failure, *provided* that the said party of the second part does not within such time be in readiness to comply with the terms of this contract.

" And should the said party of the first part, for any reason whatsoever, fail to comply with the terms and provisions of this contract, then the absolute, unqualified, unobstructed, sole and separate use of all the reservoirs, buildings, machinery, pumps, pipes, plugs, and all and every other matter or thing pertaining or belonging to the said water works, in the distribution of water throughout the said city of Columbia, together with the proceeds arising therefrom, and all the rights, immunities and privileges now belonging, or in any way appertaining to the said city of Columbia, shall vest absolutely in the party of the second part, within sixty days from the date of said failure, for the unexpired term of this contract:

" *Provided, however,* That the acceptance of this penalty by the party of the second part shall in no way preclude the said party from his proper and legal redress in the Courts, should the net proceeds of the water rents fail to amount to a sum equal to the compensation stipulated by the party of the first part to be paid to the party of the second part on his performance of his agreements entered into in this contract:

" *And provided, further,* Should the net proceeds arising from said water rents exceed the said yearly compensation of sixteen thousand dollars, then such excess shall be paid over by the said party of the second part to the said party of the first part:

" *And still further be it provided,* That at any time should the said water works, and all and every matter and thing in any way belonging or appertaining to the same, under the provisions of this penalty, fall into the hands of the said party of the second part, the said party of the first part, on the payment of all the dues that shall have accrued to the party of the second part, shall be entitled to take immediate re-possession of the said works, and all and every other matter or thing in any way belonging or appertaining to the same."

On the 9th November, 1871, Samuel A. Pearce, Jr., and William Sprague assigned the contract to the plaintiff, " with full power and authority to execute and perform " the same, " and to receive and take to the proper use of " the plaintiff " all moneys, profits and benefits that may arise therefrom," and on the same day the plaintiff covenanted and agreed with Pearce and Sprague to perform all the covenants and agreements imposed upon them by the contract.

The object of the action, the issues made by the pleadings, the facts found by the Court below, and its conclusions of law, are stated in the opinion and judgment of His Honor the Circuit Judge, which is as follows:

CARPENTER, J. The plaintiffs filed their complaint, setting forth, for a *first* cause of action, that a contract was duly made and entered into by and between the defendant, the city of Columbia, as the party of the first part, and Samuel A. Pearce, Jr., and William Sprague, their heirs, executors and assigns, as the parties of the second part, whereby they agreed and contracted to build certain works, or parts of works, and to perform certain duties and services for furnishing the defendant, the city of Columbia, with water for a period of twenty years; that, after the execution of said contract, the said Pearce and Sprague became, with Amasa Sprague, associated and incorporated by articles of agreement, and pursuant to the provisions of the statute, under the name of " The Columbia Water Power Company;" that subsequently the said Pearce and William Sprague duly assigned and transferred to the said " The Columbia Water Power Company," the plaintiffs, all their interest, rights and privileges under the said contract, with full power and authority to execute said contract, and to take and receive all profits and benefits arising therefrom; that the plaintiffs thereupon undertook to perform in all respects the said contract; that the plaintiffs, under said contract, expended large sums of money in constructing works, procuring machinery and pipes necessary to furnishing a supply of water required by said contract; that they built such parts of a new water works as were required to force 1,500,000 gallons of water daily into the distributing reservoir of the city, constructed a new receiving reservoir, and in all particulars performed the agreements and covenants contained in said contract; that, being ready to furnish the supply of water required by said contract, they gave notice to the defendant, as required by the con-

tract, that on the 21st day of November, 1872, they would commence to furnish said supply ; that on the said 21st day of November, 1872, they were fully prepared to furnish said supply, and that they have been and are at all times prepared to do so ; that the defendant, by the passage of a certain resolution of its Council, has declared itself absolved from all obligations, on its part, to fulfill said contract, and has refused to comply with the covenants on its part therein contained ; that its officers and agents have refused, in various particulars, to permit the plaintiffs to enter upon and continue the furnishing of the city with the supply of water required by the contract.

For a *second* cause of action the complaint sets forth, that by the said contract it was further stipulated that the City Clerk and Treasurer be authorized and required to pay over to the plaintiffs all water rents collected by the city, and to assess the same at a rate sufficient to raise an amount of money at least equal to the yearly compensation of sixteen thousand dollars to the plaintiffs; that under the contract the fund arising from the said water rents should remain as a security to the plaintiffs for the payment of their yearly compensation, and should not be appropriated to any other purpose ; and that the City Clerk, without other authority than is contained in said contract, should apply such proceeds of water rent to the payment of the said yearly compensation of the plaintiffs as the same should fall due ; that the said water rents and water taxes are now being collected by the city, but the plaintiffs are well assured that the defendant is not intending to apply the same to the payment of the plaintiffs ; and that the defendant intends to appropriate said water rents to other purposes, and to deprive the plaintiffs of their security under said contract.

The plaintiffs, therefore, demand judgment, that it be adjudged and decreed: (1.) That the plaintiffs have fully performed the covenants of said contract and are entitled to be let into the full performance and enjoyment of the same for furnishing the city with the stipulated supply of water for the period of twenty years. (2.) That the defendant shall do and perform, on its part, all the covenants of said contract. (3.) That the defendant be restrained from any interference with the plaintiffs in the performance of the contract. (4.) That the plaintiffs are entitled to have set apart and reserved the proceeds of the water rents for the payment of their annual compensation, and the defendant be enjoined from making

any other use of the said water rents; and (5.) That the plaintiffs may have such other relief as may be just.

The plaintiffs also exhibited with their complaint a copy of the contract therein set forth.

The defendant filed its answer, admitting the execution of the contract in question between itself and Samuel A. Pearce, Jr., for himself, and as trustee for William Sprague, in the terms set forth in the complaint, disputing and denying the interpretation put upon the contract by the plaintiffs in various essential particulars; denying that any exists between itself and the plaintiffs; denying the right of the original parties of the second part to assign or transfer their contract without the consent of the other contracting party; denying that such consent has been given; denying that there is mutuality in said contract; denying that the plaintiffs have performed the said contract on their part, as alleged in their complaint; denying that the water works were completed within the time required by the contract, or, are, in fact, now completed according to the contract; denying that it has done any injury or wrong to the plaintiffs in the manner set forth in their complaint; and denying the right of Pearce and Sprague, or either of them, to any use or control of the old water works, or any part thereof.

For answer to the plaintiffs' *second* cause of action, the defendant denies, in general, the allegations of the complaint; avers that the plaintiffs have failed to perform their covenants, and denies that the defendant has deprived the plaintiffs of any security required by said contract.

After the filing of the complaint, and before the filing of the answer, the plaintiffs moved before me for a temporary injunction, pending the full hearing of the cause, to restrain the defendant from interfering with the plaintiffs' use of the old water works, and the general execution of their contract to furnish the city with its supply of water, and to restrain the defendant from appropriating to other uses than the payment of the plaintiffs the proceeds of the water rents and water taxes. Upon the proofs and arguments then submitted, I granted the injunction restraining the defendant from all interference with plaintiffs in using the old water works, and in furnishing the city its supply of water, but denied, as premature, the application for an injunction to restrain the defendant from appropriating to other uses the proceeds of water rents and water taxes collected by the city. By a special assignment of

the Court, and upon agreement of counsel, the cause came on to be heard before me at Chambers, in Columbia, July 3d. A large number of witnesses were offered and examined by both parties, and full arguments were submitted by the respective counsel. After careful consideration and examination of the whole case, I now proceed to state my conclusions, with the reasons therefor. I may premise, however, that during the hearing of the case I refused several times to allow the defendant to introduce evidence upon points not presented by the pleadings, and in my decision I shall notice nothing except the issues which are properly embraced and presented by the complaint and answer. Those issues, in my opinion, are, in general, these:

*First.* As to the right of the plaintiffs, *as assignees*, to maintain this action.

*Second.* As to the fact of the performance, by the plaintiffs, of certain work which, by the contract, they were required to perform.

*Third.* As to the plaintiffs' right, in general, to relief, and particularly, to the special relief prayed for in the complaint.

One of the questions most elaborately discussed by the counsel for the defendant was the character and nature of the action. For the defendant, it was argued that it was strictly an action for specific performance of a contract, and subject to all the rules and principles of law governing such actions under the general equity jurisprudence. I do not, however, consider it necessary for me to determine this question specifically. It will not be found essential to the conclusions at which I have arrived to determine whether or not the present action is primarily and characteristically one for specific performance, since under either view I find no great difficulty in reaching my conclusion. It may be remarked in passing, that regarding the present action as one for specific performance, the chief argument relied on by the defendant's counsel—want of mutuality— is thus defined: "A contract, such that it might, at the time that it was entered into, have been enforced by either of the parties against the other of them."—*Fry on Specific Performance,* § 286. If, in the present case, there was an original want of mutuality in the contract, and if the contract were now unperformed by the party seeking specific performance, the objection of the want of mutuality might be important. But if the party seeking relief has fully performed his part of the contract with the permission and acquiescence, and literally in the presence of the other party, it is now plainly too

late to interpose the objection of a want of mutuality *at the time the contract was entered into.*

Proceeding now to examine the first of the main issues presented, I find that the first objection on the part of the defendant to the plaintiffs' rights, *as assignees* of the original contract, to maintain this action, is that the complaint does not correctly state the contracting parties—that it states (in Paragraph I,) that the contract was made by "Samuel A. Pearce, Jr., and William Sprague," whereas, in fact, it was made by "Samuel A. Pearce, Jr., for himself, and as trustee of William Sprague."

Under the former system of pleading, this objection might have availed as a variance between the contract alleged and the contract proved. But in equity it would not have so availed, unless it operated to the defendant's prejudice. By our Code, § 192, the equity rule has been practically adopted. "No variance between the allegation in a pleading and the proof shall be deemed material, unless it have actually misled the adverse party to his prejudice in maintaining his action or defense *upon the* merits." By the answer, the defendant admits the execution of the contract, and states the parties correctly, thus showing that the defendant was not misled. No prejudice is alleged, and it is evident that none has arisen.

The second objection urged by the defendant is, that the contract has, in fact, not been assigned, which objection means that the contract was made with *Samuel A. Pearce, Jr., and Samuel A. Pearce, Jr., as trustee of William Sprague,* while the assignment to the plaintiffs is made by *Samuel A. Pearce, Jr., and William Sprague.* But it is to me a novel objection to an instrument intended to convey the interest of a *cestui que trust,* that it is signed both by the trustee and the *cestui que trust.* If it were not signed by the latter, the objection would have possible force, but certainly it has none because it is so signed. The assignment is made by the parties, and by the only parties who have any known or alleged interest in the things assigned. It purports to be an assignment of the entire contract, and operates to convey not alone the interest of Pearce, but the interest of Pearce as trustee. His signature avails to carry both of their interests, and the signature of Sprague himself carries the interest of the *cestui que trust.* What the term " trustee " in the contract imputes, does not clearly appear. Colonel Pearce testifies that he was acting for Sprague, under a power of attorney. As such, he was " trustee

of an express trust." The law makes him so in cases where he does not disclose the name of his principal, and he may in cases where he does disclose the name of his principal so style himself.— Vourhies Annot. Code, " b," to § 113, N. Y. Code.

The third objection is, that the contract is not, in its nature, assignable, and hence, that the assignment made without the assent of the defendant is null and void. Certain kinds of contracts are notoriously non-assignable—contracts, for instance, to render what is termed " personal service "—contracts in which reference is had to the peculiar fitness, by reason of personal skill or knowledge, of the party contracting to do the work or render the service, and when such personal qualities are plainly the chief consideration which moves the other party to enter into the contract. But nothing of this sort appears in the present contract. Neither Pearce nor Sprague can be supposed, or are shown to have had any peculiar personal fitness to perform their contract. Contracts of this character—contracts for buildings, railroads, canals and other works and structures, are every day assigned. But it is not necessary to consider this ground further. This contract is, by its own express terms, assignable, being made, not alone with Pearce and Sprague, but also " with their heirs, executors and assigns." Would it be denied that the executors of these parties might enforce the stipulations of this contract? This they might do independently of the use of the word " executors " in the contract ; for the general rule of law is, that " where the contract with the deceased is of an executory nature, and the personal representative can fairly and sufficiently execute all that the deceased could have done, he may do so and enforce the contract."—1 Pars. on Con., 131, (5th Ed.) " E. Converso, the personal representative, is bound to complete such contract, and if he does not, may be made to pay damages out of the assets."—1 Pars. on Con., note "r," 131.

*A fortiori*, would this be true, where, as here, the executors are expressly named. There is as little doubt about the force of the word " assigns," when embodied in a contract, as in the present case. Its use engrafts upon the instrument as the express agreement of the contracting parties, independently of the assignable nature of the contract, that it shall be assignable. The law upon this point is too plain and familiar to require more than a statement. If it had been the intention of these contracting parties, that the contract should not be assignable, it is inconceivable that

they should not only fail to make it in terms non-assignable, but actually adopt the word "assigns." To the further objection, that without the assent of the defendant there is no such privity as will enable the plaintiff to maintain this action, it is only necessary to say that if the contract be assignable, the assignment, of itself, creates privity, and operates to place the assignees in the stead of the original parties. It is only in case the contract is not in its nature or terms assignable that assent is necessary.

The second general issue presented by the pleadings involves the fact of the performance by the plaintiff of that part of the contract, upon the completion of which the plaintiffs were entitled to furnish the city with its daily supply of water for twenty years. In the investigation of this question, it is important to consider what was the contract which the plaintiffs undertook to perform, as a contract precedent to the right to assume the performance of the second and main purpose of the agreement. What the contract is between the parties, its terms, conditions and meaning, is a question for the Court—to be determined upon an examination of the written agreement applied to its subject-matter. The construction of contracts "must depend upon the intention of the parties, to be collected in each particular case from the terms of the agreement itself, and from the subject-matter to which it relates." "It cannot depend upon any formal arrangement of the words, but on the thing as it is to be collected from the whole contract."—2 Pars. on Con., 527.

The Court must, therefore, construct this contract, and develop its terms and provisions upon an examination of the whole agreement with reference to its subject-matter, general scope and purpose. From the pleadings and proof, it appears that at the time said contract was entered into, the defendant had in operation a system of water works complete in itself, with which the city was then supplied with water; that these works were then being operated with steam power; that the only supplies of water then available for the use of the city were the springs then supplying water to the reservoirs; that the supply of water from these sources was something over two hundred thousand gallons daily; that it was deemed desirable, in view of the possible present and certain prospective wants of the city, that the capacity of the existing works should be increased, and other and greater supplies furnished for the use of the city; and that the works should there-

after be operated by water instead of steam power, which water power was then owned and controlled by the plaintiffs. The stipulations of the agreement on the part of the plaintiffs involved the construction of such parts of the new water works as should be required to give to the then existing water works the desired increase of forcing capacity; the furnishing of the city during the term of the contract with its daily supply of water; furnishing the water power for the operation of the works, and all the labor and management of the machinery and appurtenances; and the turning over to the city, upon the expiration of the contract, of the works, " in good order and repair."

On the part of the defendant, the agreement was to pay to the plaintiffs, in consideration of the performance by them of said contract, the annual sum of sixteen thousand dollars, in quarterly installments, the payments to commence from the time when the plaintiffs should begin to furnish the city its supply of water under the contract. Other stipulations are embodied in the agreement, which need not, in this connection, be considered, except in so far as they tend to the proper understanding of the foregoing salient elements of the contract. It is clear that, by the terms of the agreement, it was a condition precedent to the plaintiffs' right to enter upon the contract to furnish water, that they should first construct the additional parts of the works which were required to be by them constructed. The whole contract may be considered as an agreement on the part of the plaintiffs to furnish the city its daily supply of water for the stipulated term, using for that purpose all of the old water works except the steam engine and forcing apparatus, together with the newly constructed parts, and furnish their own water power, labor and management.

The plaintiffs, in their complaint, aver that they have, in every particular, fulfilled their contract as to the construction of the additional works required to be by them constructed; that on the 21st November last they were ready, in all respects, to furnish to the city its supply of water; that they had repeatedly undertaken so to do, but that they were prevented by the interferences of the defendant from so doing. This fact as to the performance by the plaintiffs of their contract, and as to their ability to perform it, in respect of furnishing the supply of water, the defendant denies; and this denial presents the main issue of facts to be determined by the Court.

The relief which the plaintiffs ask by their complaint is an injunction (in the nature of a perpetual injunction) against all such interferences by the defendant as hinder them, in the performance of their contract to supply the city with water during the term of their contract.

To entitle them to this relief it is incumbent upon them to show that, by reason of their performance of the condition precedent, to wit, the construction of the additional works, &c., they are entitled to have the enjoyment of the further contract to supply the city with water, and the emoluments incident thereto.

The conduct of the defendant, in the matter of the alleged interferences, is predicated upon a denial of the plaintiffs' right to the enjoyment of this contract. In the resolution of the Council of September 3, 1872, they say (in reply to plaintiffs' communication of August 22) that the plaintiffs "have failed entirely in the performance of said contract, thereby disregarding the necessity and endangering the property of the corporation," and thereupon resolve: "That the City Council is absolved from all obligation to fulfill the said contract, and in its behalf the said City Council refuse to comply with the covenants on its part therein contained." See MS. copy Council Proceedings. On the 12th November, 1872, the City Council, in reply to plaintiffs' communication of the 11th November, wherein defendant was informed that, on the 21st November, the plaintiffs would be prepared to furnish, and would furnish, the city with its supply of water, re-affirm their action of September 3, and state that "although there may have been a binding contract between the parties previous to the 21st day of August last, (1872), that then and after that the same became null and void, as to the city of Columbia, by reason of the failure of the said Samuel A. Pearce, Jr., for himself, and as trustee of William Sprague, to comply with the terms thereof on their part." From this action of the City Council, as well as from the contents of the testimony offered by defendant, and from the argument of defendant's counsel, it is seen that the denial of the plaintiffs' right to the enjoyment of this contract is predicated on these grounds, to wit:

1. Upon the ground that the plaintiffs have forfeited their contract by reason of non-performance within two years.

2. Upon the ground that they have "failed entirely in the performance" of the contract, thus entitling the defendant to treat the agreement as a nullity.

3. Upon the ground that the contract has not been performed by the parties with whom the defendant contracted.

The first of these grounds proceeds upon the assumption that the limitation of two years, within which the additional works were required to be constructed, was "of the essence of the contract," in such sense as to entitle the defendant to treat the contract as a nullity, because not performed within the time limited. Although this point appears not to have been insisted on in the argument it is, nevertheless, proper to give it some consideration. The general rule in equity is, that "time is not of the essence of a contract." It is said, however, that " parties may contract on what terms they will, and may declare, if they think fit, that it shall be so considered," or "time may be implied as essential in a contract, from the nature of the subject-matter with which the parties are dealing."— Adams' Equity, 88 ; Fry on Specific Performance, § 713.

To make the time to be a matter of essence, it is, however, not enough that a time is fixed within which a certain thing shall be done. " In order to render time thus essential, it must be clearly and expressly stipulated that it shall be so."—Fry on Spec. Perf., § 712. " The mere fact that a day has been specified for completion, will not, *per se*, render it essential."—Adams' Eq., 88.

An examination of the authorities on this point will show that time is in no case deemed essential in such sense as to entitle a party to disaffirm the contract, unless :

1. It was expressly stipulated that the time should be essential.

2. Or the essentiality is implied from the nature of the subject-matter with which the parties dealt.

3. Or, is made essential by reason of injuries sustained by reason of the non-performance within the time.

These principles are fully recognized by decisions in our own State, to which I need not refer at large. In *Doar* vs. *Gibbes*, Bail. Eq., 371, it is said : " Time is not usually of the essence of a contract, but may become so, if the delay is injurious." In *Sarter* vs. *Gordan*, 1 Hill Ch., 126, it is said : " To be sure, great, and long continued non-performance will, in some instances, in which circumstances are greatly changed, be construed into an abandonment of the bargain. This, however, is rare, and takes place only when the conduct of the parties indicates the intention to abandon the contract, or the delays have produced great injury to the one seeking to get rid of the contract."

There is, in this connection, still another principle to be noted, to wit: That in cases where it is not expressly stipulated that the time shall be essential, or where it is not essential, from the very nature of the subject-matter, if a party intends to rely upon it as essential, he must give to the other party reasonable notice of such purpose, and act promptly upon the non-compliance.—Fry on Spec. Perf., § 724, etc.

" Time may be always made material by either party if he chooses. Either may demand performance on the stipulated day, and if the other do not then comply, may elect to rescind, which rescision will free him from the obligations of the contract in law and equity."—See authorities in note 1, Adam. Eq., 88, 5th Am. Ed.

" But if time is to be considered of the essence of a contract, the point must be made promptly."—See Adam. Eq., 88, note 1.

In *Thomas* ads. *Woodruff*, 2 Sp., 158, " the limitation of time within which the work was to be done "—digging a well—" was not insisted on by the defendant, at the moment of its expiration. He suffered the plaintiff to continue digging the well for nearly two months afterwards. This was a waiver of the limitation."

It is further held, that " the notice, thus to engraft time into the contract, must be express, distinct and unequivocal. Thus a notice that one party would consider the non-performance, by a certain day, as equivalent to a refusal to perform, the contract would then be considered as rescinded."—Fry, § 728.

" The time specified by the notice must be long enough for the proper doing of the things required to be done, and if it be not so, the notice will fail in engrafting time into the essence of the contract."—Fry, § 724.

To apply these principles : It is not asserted that, by express stipulation, the term of two years was made of the essence of this contract. Nor can it be assumed, from the very nature of the contract, that time was a matter of essence, or that it became so by reason of injury caused. Neither is it averred that, by any timely and reasonable notice, the defendant has engrafted the time into the essence of the contract. On the contrary, not only was there no such notice given prior to the expiration of the time, or at the moment of its expiration, but not until the 3d September was there given to the plaintiffs any intimation of a purpose to disaffirm the contract because of its non-performance. On the contrary, the plaintiffs were constructing their works all

this time, with the knowledge and supervision of the defendant. But without pressing this inquiry further, it is manifest, from the very face of the contract, that the parties did not regard the limitation of two years as a material or essential element of the contract. On the contrary, having in view the contingency of failure in this regard, they agreed to insert a penalty for such a failure, to be paid to the defendant, provided that the plaintiffs should not, within three months after such failure, "be in readiness to comply with the terms of the contract." A fair and reasonable construction of the agreement points this stipulation to the contract to supply the city with water, and imports an extension of the time of two years, within which extension, if the plaintiffs should be in readiness to comply with their contract, there should then exist no right in the defendant to exact the penalty, much less a right to disaffirm the contract.

The *second* ground of denial of the plaintiffs' right to the enjoyment of the contract to supply the city with water, proceeds upon the allegation of an entire failure on the part of the plaintiffs to perform their contract as to the construction of the additional works. "Defendant denies that the new water works were fully completed and finished in the month of November, 1872; denies that the parties of the second part were ready to enter upon the performance of that part of the contract whereby they were required to furnish the supply of water; denies that on the 21st November the parties of the second part were prepared to supply the city with water, according to the terms of said contract. On the contrary, defendant avers that the said parties of the second part were not then, have not been since, and are not now ready to furnish the city its supply of water under the terms of the said contract."

From the language of the denial, and from what follows in immediate connection in the answer, it resolves itself into three heads, to wit: 1. A denial that the works were constructed. 2. A denial of their sufficiency. 3. A denial of the plaintiffs' right to use "the old receiving reservoir, the distributing reservoir, and certain piping—being part and parcel of the old water works."

(1.) What were the "parts of a new water works" which the plaintiffs contracted to build are enumerated in the first paragraph of the agreement. They are also stated in paragraph 1 of the complaint, the correctness of which is admitted in paragraph 1

of the answer; "but for a more complete statement the defendant prefers the words of the contract itself." No issues of fact are raised in the testimony, either as to the construction of the new reservoir, the erection of the building to protect the machinery, or as to the laying of the section pipe to the river. The defendant assumes, in its answer, and contended in argument, that by the agreement the measure of the water power capacity to be furnished by plaintiffs was one and a half millions of gallons daily. I have not been able to take this view of the contract. It seems clear that the agreement discriminates between the capacity of the forcing machinery and the water power. The former was to have a capacity equal to one and a half millions daily; the latter was to be sufficient for the daily supply of the city. It is inconceivable to suppose that the contracting parties intended to provide power for one and a half millions daily, when they well knew that the distributing reservoir would contain only one million of gallons, and when they expressly stipulated for the enlarging of the reservoir, if at any time it should be found "insufficient to contain the daily supply of water required by the city." It seems, therefore, that by the letter of the agreement, and its manifest purpose, that the plaintiffs are required to furnish a sufficient water power for the daily supply of the city only, and not a power sufficient to force up one and a half millions of gallons, unless that amount shall hereafter be required for the daily use of the city. As to the quantity of water now required by the city, the witnesses on that point, without exception, concur in the statement that the supply from the springs, utilized before the completion of the new works, has been ample; that it was so even when, during the war, the population of the city was much greater than now. The evidence further shows that, taking the highest estimate for manufacturing cities in the United States, and estimating the population at twelve thousand, the city would require but four hundred and eighty thousand gallons daily; and that the present water power furnished by plaintiffs is adequate for that amount cannot be seriously doubted. I am of the opinion, from the testimony, that the plaintiffs have now sufficient water power to force up into the distributing reservoir daily the full amount of one and a half millions. It is also contended by the defendant that there will not remain for plaintiffs' use that amount of water power if the Penitentiary be allowed its complement under the

contract with the State; and that plaintiffs must fail as to one or the other of their contracts. It will be observed, by reference to the plaintiffs' contract with the State, that the power to be furnished is so much as may be necessary for the Penitentiary. According to the testimony, that institution now requires about twenty-five horse power three or four hours in each day, and under no circumstances could such power be used for more than ten of the twenty-four hours, and that fifty horse power will, in all probability, be the *maximum* that can be required during the continuance of the contract. But assuming that more power will be required by the State than plaintiffs now furnish, that would compel them to raise the dam at the head of the canal, or in some other way provide the increased capacity required.

The plaintiffs cannot be required to provide against a willful waste of water power by the State any more than they could be required to provide against a wanton and malignant destruction of their machinery. The proofs show that, from some unexplained motive, the State has now a Turbine wheel for the use of the Penitentiary, of two hundred and seventy horse power, when one of twenty-five would be ample for all purposes. This causes an enormous waste. It is not only a serious infringement of the plaintiffs' contract with the State, but is against its settled policy, and the highest interests of both city and State. The object the General Assembly had in view when the sale of the canal at a nominal price was made to the assignors of the plaintiffs, was the development of this gigantic power, and the consequent influx of capital and people; in brief, to compete successfully with our sister cities of the North and West, in the race of wealth and population. To do this, great as our resources are, they must be husbanded, not squandered.

Much stress was laid in the argument upon the failure of the plaintiffs to furnish the filter required by the contract. The evidence shows conclusively that the first patent filter provided broke down, under experiment, and was wholly inadequate for the purification of river water. According to the agreement, the suction pipe and filter are required in a certain contingency; the one " to be used to obtain water " from the river, " should the other streams fail to furnish a sufficient supply," the other " for purifying the water from said river, if such water should be required." Plaintiffs having purchased, in good faith, the filter

first tried, finding it inadequate, and within a reasonable time substituting another that is adequate, is a substantial compliance with that portion of their contract. Much testimony was offered by the defendant tending to show the insufficiency of the supports, props, gearing, &c., of the new works. It is not considered necessary to examine these questions in detail. The plaintiffs have constructed their works, and are compelled, by their contract, not only to supply the city with water during the time designated, but, at the expiration of the time, to turn them over to the city "in good order and repair." For a breach of either covenant the plaintiffs will be liable to the city. Whether these are properly or improperly constructed, the works are, and have been for months, in successful operation, and, in the face of that fact, such testimony cannot avail as a ground of exception to their sufficiency.

The assumption upon which the denial of the performance of the contract in one respect is based, is, that the plaintiffs, in furnishing the city its daily supply of water, have no right to use any portion of the old works, and, without their use, they were not, on the 21st of November last, and are not now, ready to furnish any water for the city. The defendant charges that the plaintiffs, in the use of the "receiving and distributing reservoirs and piping, have wrongfully seized upon' the old city water works," and with having "seized the property, and usurped the rights of the defendant," that the same is "wholly outside of any contract, and, measured by the terms of the contract, is a trespass." The denial assumes that, under their contract, plaintiffs were required to build reservoirs in lieu of the old receiving and distributing reservoirs, and to lay entire new piping. The views entertained by the defendant in regard to the meaning of the agreement as above stated, and, in reference to the plaintiffs' being bound to furnish one hundred horse power for the Penitentiary, *night* and *day*, would seem to be the result of a distempered imagination, or chronic personal feeling, but for the exalted character of the learned counsel, and the earnestness and gravity with which they are maintained. By the terms of the contract, plaintiffs were to build such parts of a new water works as are required to force one and a half millions of gallons daily into the distributing reservoir. "Parts" of a thing are less than the whole. The construction of new reservoirs instead of the old, and the laying of new

pipes from one or the other, are not things enumerated to be done in the contract, nor are they, or either of them, necessary, in order to give the works the increased capacity. Besides this, there is an express stipulation. in the contract, that should the distributing reservoir be found, at any time, insufficient for the daily supply of water, it was to be enlarged by the defendant. The old receiving reservoir, having a capacity of six hundred thousand gallons, was sufficient, always had been, and always would be, to hold the daily accumulations from the springs. The additional supply provided for in the contract to meet the future wants of increased population, whether from the springs below the old receiving reservoir or the river, could not fall into this reservoir; and hence the provision for the construction of a new receiving reservoir "near the Columbia Canal." It is unreasonable to suppose that the party intended to take out of use "forty thousand dollars' worth of piping" that was in good order, and answered all the purposes of the city as well as any that could be made. New pipes would not give increased capacity; they are not stipulated for in the contract, nor is there any implication therein warranting their construction. The old pipes, part of the old works, are fully adequate to meet the demands of the city for water, and to quadruple that demand. As the plaintiffs are bound by their contract "to build such parts of a new water works as are required to force one and a half millions of gallons of water daily into the distributing reservoir," how can it be contended that they are bound to build "parts" which are not required for that purpose. The old line of pipes being already sufficient, nothing was required except to connect the new with them, so as to form a continuous line. It is contended by the defendant, the plaintiffs have no right to use the old pipes. What is the meaning of the provisions of the contract, that "the steam engine, and all the appurtenances now used by the said city for forcing water into the distributing reservoir, should remain in their then condition for two years after the new water works should be completed, subject to the use of the plaintiffs if their machinery should be out of order? The steam engine and apparatus were connected with the old pipes, and if entire new piping was to be built, wholly unconnected with the old, of what use would the engine and apparatus be to the city or to the plaintiffs?

The obligations of the plaintiffs are "to furnish sufficient water power to force into the distributing reservoir the number of gallons

required by the city daily," * * and all "the labor and management of the machinery, and appurtenances thereto." These obligations impose the duty on the plaintiffs of furnishing in the distributing reservoir all the water required for the needful supply of the city, and to furnish the best water obtainable from the sources mentioned in the contract. To carry out this part of the agreement the pipes that conduct the water to the receiving reservoir, and the reservoirs, must be kept clean and in otherwise good order. The undertaking of the plaintiffs begins with taking water from the springs, or river, in case the supply from the former is inadequate, and ends by the water being kept in the distributing reservoir, in good condition for the reception of the same, by defendant. Not only are the plaintiffs to furnish the necessary machinery and apparatus to accomplish the result, but "the labor and management," and this involves, in my judgment, the whole process of collecting the water and forcing it into the distributing reservoir. To enable the plaintiffs to do this successfully, the entire management and control of the old and new works, under the contract, vests in the plaintiffs—not the property itself, which is owned by the city, but the use of it during the life of the contract. The city has nothing to do with its management, and no responsibility for the labor required for that purpose. The control of the plaintiffs over so much of the works as are required to place in the distributing reservoir the supply of water daily required for the city, is as absolute as though they were the lessees, with a covenant for quiet enjoyment. The distributing pipes, hydrants, &c., are wholly outside of the contract; they are parts of the old works, but not parts required to force the water into the distributing reservoir. Hence over the supply pipes and appurtenances the control of the defendant, as owner and possessor, is unquestionable. The city has the same police superintendence over the receiving and forcing works that it has over any other property in the corporate limits; but the plaintiffs are charged, by their contract, with the legal custody, control and operation, and this custody and operation is a part of the consideration for the payment of sixteen thousand dollars a year. The contract is silent upon this point, but this construction seems necessary to carry out its provisions.

The other question raised by the pleadings is as to the plaintiffs' right, in general, to relief, and specially to the relief prayed for. The interference by injunction "rests on the principle of a clear and

certain right to the enjoyment of the subject in question, and an injurious interruption of that right, which, on just and equitable grounds, ought to be prevented."—Hill. on Injunc., 12.

The plaintiffs having complied with the condition precedent by building such parts of the new works as they were required to do by their contract, and having entered upon its performance by furnishing the city with the particular water specified in their agreement, their machinery and works being sufficient to enable them to carry out the full provisions thereof, the defendant interfered, by cutting off the plaintiffs from access to the supply of water which they were required to furnish by preventing plaintiffs' communication with the distributing reservoir, and in continuing to use the old steam power, thereby endangering the safety of the pipes. Under this state of facts, I am of the opinion that the plaintiffs are entitled to the relief prayed for in their complaint.

I find, as matters of fact:

1. That the contract referred to in the pleadings was duly executed between Pearce and Sprague, and the defendant.

2. That the said contract was by Pearce and Sprague assigned to the plaintiffs for a valuable consideration.

3. That the plaintiffs had constructed such parts of the new water works as their contract required, prior to the 21st November, 1872, and were then, and ever since have been, prepared to supply the city with water according to the terms of their contract.

4. That the plaintiffs have, in good faith, complied with the provisions of their agreement.

I find, as matter of law:

1. That the contract was assignable.

2. That time was not of the essence of this contract, and that the completion of the works prior to the 21st of November, 1872, was a legal compliance with its provisions.

3. That under their contract the plaintiffs are entitled to use all such parts of the old works as are necessary to the forcing the required supply of water into the distributing reservoir.

It is, therefore, ordered and adjudged:

1. That the temporary injunction heretofore granted in this cause be made permanent.

2. That the defendant is hereby enjoined from appropriating the

moneys arising from the water rents for any purpose other than payment to the plaintiffs according to the terms of their contract.

3. That the defendant pay the plaintiffs the sum of $12,000, within ninety days from the finding of this judgment, with interest on $4,000 from the 21st day of February, 1873, with interest on $4,000 from the 21st day of May, 1873, and with interest on $4,000 from the 21st day of August, 1873.

4. That the defendant pay the costs of this action.

The defendant appealed upon the following grounds:

1. That His Honor should have held that the proceeding instituted by the plaintiff, as the title of the cause expresses in terms, as the facts set forth in the complaint clearly show, and as the prayers for relief expressly ask, was a proceeding invoking the extraordinary powers of the Court to enforce as an equitable remedy the specific performance of a contract stated in the several causes of action, and was governed by the recognized rules of equity applicable in such case; and to hold otherwise was error in the decree, and misleading to the defendant.

·2. That, having held the first proposition, His Honor should have next held that, by the terms of the contract, there was a want of mutuality between the original parties to the agreement, in this, that the chief feature, if not the very hinge of the contract, to wit, the acquisition of a water power to be substituted for the old steam power heretofore used, was to be determined by an arbitration, as to which stipulation a specific performance could not be enforced in equity against either party, and as a specific performance of a contract will not be decreed unless a performance of the whole contract can be so decreed and enforced specifically, the Court should in this case have refused to decree a performance for the want of mutuality between the original parties to this contract, this inherent defect necessarily extending itself to any assigns under the same, thereby creating a want of mutuality between the parties to this action; and for this reason the complaint should have been dismissed, and to hold otherwise was error in the decree.

3. That, having held the two last propositions, His Honor should have next held that the contract was made by and between the city of Columbia on the one part, and by Samuel A. Pearce, in his own right, and by Samuel A. Pearce, as trustee, on the *other part*; that William Sprague, individually, was a stranger to the contract, and

as such, was not bound in person 'or estate by its terms; that between William Sprague and the city of Columbia there was no privity of contract, and no mutuality of obligation whatsoever; and to hold otherwise was error in the decree, and a misunderstanding of the defendant's argument.

4. That having held these three last propositions, His Honor should have next held that there is no such thing in law as making a contract with the personal representatives of any living person, nor with the assigns of any contracting party; on the contrary, a contract is in law with the principal himself, who undertakes, when bound himself, to bind his executors, administrators and assigns, according to the nature of the contract. That, by the terms of this contract, William Sprague was not a party, and had entered into no covenant with the defendant to bind either himself or his executors, administrators or assigns; that Samuel A. Pearce could not assign the equitable interest in the contract, as trustee, without a power in that behalf duly made and strictly pursued, which power was not produced or proved; that the said Samuel A. Pearce, Jr., by his own convenant, seal and signature, could, in no sense, bind the said William Sprague personally, much less could he bind the personal representatives and assigns of William Sprague to a contract to which William Sprague was not himself a party, and his executors, administrators and assigns, necessarily, neither in law nor in fact parties; and to hold otherwise was error in the decree, and a misunderstanding of the points made in defendant's answer and in his argument.

5. That, having held these last four propositions, His Honor should have next held that in the supposed assignment made by William Sprague and Samuel A. Pearce, each for himself, of the said contract to plaintiff, the interest of Samuel A. Pearce, as trustee, was not assigned, and William Sprague, being not personally a party to the contract, had no personal interest in himself to assign to any one by his individual assignment; that, by the supposed assignment, therefore, the plaintiff took no interest except several interest in the contract of the said Samuel A. Pearce, whatever that may mean, (the extent of *his* personal interest not having been proved at the trial;) that the contract, being a joint contract, on the part of Samuel A. Pearce *for himself*, and Samuel A. Pearce *as trustee*, the interest of one joint contracting party could not be assigned in severalty, and the plaintiff, as the supposed assignee,

took nothing by the assignment which created a *privity* of contract between the plaintiff, as such assignee, and the defendant; and to hold otherwise was error in the decree and a misunderstanding of defendant's argument.

6. That having held these last five propositions, His Honor should have next held that the plaintiff, under such supposed assignment, could maintain no action asking a specific performance, as assignee, (if no other objection existed) against the defendant, and the defendant could institute no action against plaintiff upon which a prayer for a specific performance could be predicated, the foundation of said jurisdiction resting in privity of contract, and in mutuality of obligation, without which the Court must refuse its aid in equity, and leave the parties to their action for damages as they may be advised ; and to hold otherwise was error in the decree and a misunderstanding of defendant's argument.

7. That having held these last six propositions, His Honor should have further held that in a real covenant, or a covenant running with land, the assigns in the land will be bound, (usually whether named or not,) because the covenant binds the land and follows it into the hands of all holders or assigns under the covenanter, but in a personal contract to perform a debt or duty the executor or administrator of the covenanter will be bound (usually whether named or not,) but the assigns (whether named or not) will not be bound by such contract, and the contract would, in all respects, stand as if the word " assign " had been stricken from the contract as unmeaning surplusage ; and to hold otherwise was error in the decree.

8. That having held these last seven propositions, His Honor should have next held, where the defendant could have, under such contract and assignment, no remedy against the assignee for a specific performance, that in such case the obligation is not mutual, and the relief by way of a specific performance should be withheld from both parties or either seeking it in this Court, and for the reasons herein assigned the complaint should have been dismissed ; and to hold otherwise was error.

9. That His Honor should have further held that from the begining of the contract the defendant had its dealings entirely with Samuel A. Pearce, one of the original parties to the same, without notice of any kind of the assignment of the contract to the present plaintiff, the only evidence of notice being the recording of the

assignment, of which fact the defendant was wholly ignorant, the said instrument not being of such a nature as was required by law to be recorded, and could not therefore operate even as constructive notice to the defendant; it was, therefore, not true that the party now " seeking relief has fully performed his part of the contract with the permission and acquiescence, and literally in the presence of the other party ;" on the contrary, at the earliest moment that the information came to the knowledge of the defendant, prompt objection was interposed, to wit: on the 3d September, 1872, and reaffirmed on the 12th November, 1872; and to hold otherwise was error in the decree.

10. That the contract, not having been complied with by the parties who contracted with the defendant at the time specified, their rights under the contract were forfeited, time being of the essence of the original contract, and if not so originally, being made so by the notification of the defendants to the parties who contracted with it; and to hold otherwise was error in the decree.

11. That refusing to dismiss the complaint, His Honor should have certainly held, with the contract before him, that a Court will never undertake to " construct " a contract for parties who are bound to " construct " their contract for themselves, however the Court may anxiously endeavor to *construe* a contract according to the terms in which it may have been constructed, and by that means arrive at the true intention of the parties to the same; that upon this rule the contract, when clear, mutual, equitable and capable of being specifically enforced, will receive·the aid of the Court, and not otherwise.

12. That having held the last proposition, His Honor should have next held that the object of the contracting parties was evidently to confer upon each other mutual benefits, duties and responsibilities; and when it clearly appeared by the evidence that the city of Columbia had heretofore been amply supplied with water, at the cost of between six and seven thousand dollars per annum, and when it appeared by the contract that the city of Columbia was, for a term of twenty years, to pay to the other contracting party the large sum of sixteen thousand dollars per annum, aggregating during the term the great sum of three hundred and twenty thousand dollars, the Court would zealously inquire into the benefits to be derived under the contract by the city of Columbia, and before decreeing a specific performance would narrowly examine and ascertain the *quid pro quo*.

13. That, having correctly held that "parts of a thing are less than the whole," His Honor should have then held that the "whole" water works of the city meant the collecting reservoir and pipes, the collecting and the forcing appurtenances thereto, together with the distributing reservoir and the distributing pipes appurtenant thereto, making a set of works in whole; that the distributing reservoir and pipes appurtenant were to remain as they were, and the "parts" to be supplied under the contract by the parties of the second part were a new collecting reservoir and pipes appurtenant thereto, and all other things necessary to fulfil their express undertaking to deliver a certain quantity of water daily into the distributing reservoir of the city; that by the express terms of the contract the water was to be collected from two sources, to wit: "From streams below the present receiving reservoir," and should these streams "fail to furnish a sufficient supply, then the water was to be drawn from the river;" that the object of the contract was to develop new and distinct sources of supply; that certain specified things were named to be done, but as water could not be collected in the new collecting reservoir, to be built without pipes, from the new springs that were to be developed, and could not be forced into the distributing reservoir, according to the express terms of the contract, without connecting pipes between the new collecting reservoir at the river and the distributing reservoir in the city, these appurtenances became part and parcel of the contract, which could not otherwise be fulfilled, as there was no other provision for it in the contract; and to hold otherwise was error in construing the contract and error in the decree.

14. That, having held the last proposition, His Honor should have next held, that so far from the contract having been complied with by the contracting parties of the second part or the plaintiff, they had then and before that time, and have ever since been wrongfully appropriating to their own use the old collecting reservoir of the city, and drawing their supply of water from sources not named or ever contemplated by the contract, viz., from springs and through pipes that belong to the city, which have never been granted to said parties, and from the beginning have been and are now forcing the water thus collected wrongfully through pipes, also the property of the city, which are part and parcel of the old collecting and forcing works of the city, and are not named in the contract except in so far that as appurtenances in the steam engine

and all the apparatus now (then) used by the said city for forcing water into the distributing reservoir, they are to be and remain in the place and condition it now is (then was) in for the period of two years from the time when the party of the second part begins to supply the city with water, subject to the use of the party of the second part, at his expense, should any accident or unforeseen event occur which would temporarily render his machinery inoperative; and herein the decree granting an injuction order against the defendant, being dated the 6th day of February, 1873, whereby its property was thus in effect taken from the possession of the city and delivered to the plaintiff, was error, and comes up now for review in this appeal, and the final decree extending the injunction order and making the same perpetual is, for the same reasons, also error, and should be reversed.

15. That, having held the last proposition, and it appearing by the evidence that neither the parties of the first part, nor the present plaintiff, had developed, as contemplated by the contract, any new springs below the old receiving reservoir, except one, furnishing but a few thousand gallons of water daily, and had furnished no proper filterer for the water drawn from the river, and had constructed no connecting pipes between the new collecting reservoir at the river and the distributing reservoir in the city, they had not complied with their contract, and could not, in fact, supply one drop of water to the city, much less the quantity stipulated to be by them supplied under the contract; and to hold otherwise was error in the construction of the contract, against the plain meaning of the parties, and was error in the decree.

16. That, failing to hold the last proposition, His Honor should certainly have held that the plaintiff was bound by the terms of the contract, and for the large consideration of sixteen thousand dollars per annum, to construct such "works" and supply such "power" as were capable of furnishing one million five hundred thousand gallons of water to the city daily, (although the same may not of necessity have been immediately called for,) that the "power" to be furnished could not, under the contract, be separated from the capacity of the "works," the one being useless without the other; and, further, that the plaintiff could not at any time, and could not at the trial, have furnished one million five hundred thousand gallons of water of any kind, fit for the use of the city, for the reason that all of the springs together were wholly inade-

quate for such supply; that the water from the river was not available without filtration; that there was no proper filterer constructed by the plaintiff; that the one first used was worthless, and the subsequent one a mere sham, containing as an area only one hundred and eleven square yards, while, by works of authority admitted in evidence, it was conclusively shown that to filter for use one million five hundred thousand gallons of water in twenty-four hours would require a filterer containing an area of at least two thousand square yards; that the filterer being otherwise wholly defective, no supply of water whatever could be drawn from that source; and to hold otherwise was error in the decree.

17. That, having held the last proposition, His Honor should have next held that so far from the present capacity of the distributing reservoir, one million of gallons of water, being assigned as a reason for constructing the contract in such manner as not to require, under the said contract, the full capacity of one million five hundred thousand gallons of pure water daily, the obvious fact that nearly as much water would daily run out of the distributing reservoir as could be forced daily into it would not only negative any such construction, but when taken with the further provision in the contract for enlarging the distributing reservoir, if more than one million five hundred thousand gallons should be required in the future, it was conclusive of the meaning of the contract as to the prerequisite collecting, forcing and purifying capacity, as well as permanent strength of the works, to be built within two years from the date of the contract; and to hold otherwise was error in the decree.

18. That His Honor should have next held that, by the terms of the sale from the State to the parties of the second part, of the Columbia Canal, "it was expressly stipulated that one hundred horse-power should be reserved to the State for the use of the Penitentiary," that this "power" so reserved did not belong to the contracting parties of the second part, and in attempting to show that they had sufficient "power" under this contract to force one million five hundred thousand gallons of water daily into the distributing reservoir, it was first necessary to show that this supply "power" remained, after deducting what was allowed by law for the Penitentiary, inasmuch as the surplus was all that the contracting party of the first part could rely upon as available at all times under this contract; the fact of the necessity of working the Peni-

tentiary works night and day to exhaust the power reserved, being wholly beside the question made in the argument; and to hold otherwise was error in the decree.

19. That His Honor should have next held that, in estimating the present character and structure of the works, the cost in constructing the same, and all evidence going to show that the works were temporary and not permanent, should have been received in evidence and gravely considered, and for His Honor to hold, in this regard, that it was not necessary to examine the evidence " tending to show the insufficiency of the supports, props, gearing, &c., of the new works," and that " whether these were properly or improperly constructed," cannot " in the face " of the present " successful operation," avail as a ground of exception to their sufficiency, was error in the decree.

20. That His Honor should have held that, from the very nature of the contract, it could not be specifically enforced as an equitable remedy, not even if the Court should undertake, or could condescend to make itself an overseer of the contract for the next twenty years.

21. That, taking the construction of the contract contended for by the plaintiff, it is neither clear, reasonable nor equitable, but, on the contrary, it is a hard bargain, unequal, unrighteous, and against conscience, and His Honor should have so held, and declined the aid of the Court to enforce the same, and the decree for so much money rests upon no part of the complaint, as set up in the plaintiff's sworn causes of action, and was, in fact, not a question for the Court, but upon a properly formed complaint, would have presented a question to be determined by a jury.

*Tradewell*, City Attorney, with whom were *Pope & Haskell, Butler & DeSaussure, Bachman & Youmans*, for appellant.

*Melton & Clark*, with whom were *Melton & Chamberlaim*, contra.

The opinion of the Court was delivered by

WILLARD, A. J.　The first exception contends that the judgment of the Circuit Court is erroneous in not treating the action as one of an equitable character, based on the equitable doctrines of specific performance. If what is intended by specific performance by the exception is the proceeding in equity to specifically enforce a

contract incapable of enforcement at law, as, for instance, where the contract conflicts with the statute of frauds, then clearly the rules governing that proceeding have, as a whole, no application to the present case.

In an enlarged sense of the term, the present action is based on specific performance, and was so regarded and treated by the Circuit Court. Usually the terms of contracts relating to personal rights are not specifically enforced, but the party aggrieved by want of performance or by improper performance is left to his action at law to recover damages for the injury sustained by him. There are, however, well established exceptions to this, general rule, and one of these exceptions embraces the present case. Where a party, by grant, covenant or contract, upon consideration, provides for something to be done on his own land of such a nature that the products of the labor and materials supplied by the other party may be either rendered valueless to him or become, by operation of law, the property of the owner of the land through the exercise of the right of dominion over the land vested in its owner, and such owner attempts to exercise his right of dominion for the purpose of depriving the opposite party of the benefits of his grant, covenant or contract, equity will interfere, where necessary, to restrain the exercise of such dominion, and to establish the grant, covenant, or contract rights, between the parties. To this principle the protection of mining rights and certain servitudes and franchises by the Courts of equity as against the owner of the land in which they are enjoyed may be ascribed.

The view of the case taken by the Circuit Court does not essentially differ from that just presented.

The second exception is based upon a provision of the contract having reference to the period of its expiration. The plaintiffs' assignors being the owners of the water power by which the hydraulic works were intended to be actuated, a provision was inserted in the contract to the effect that at the expiration of the contract the defendants should be entitled to be supplied with water power at a price to be fixed by arbitrators chosen by the respective parties. It is now contended that the enforcement of this provision, as it regards the appointment of arbitrators and the proceedings for fixing the price to be paid by the defendants for the use of the requisite water power, is, from its nature, incapable of attainment in equity, and, therefore, that the contract lacks mutuality

and as such is incapable of enforcement under the rules governing specific performance.

It is not pretended that, in order to accomplish the objects of the present complaint, this provision must be executed. We are not called upon at the present time to say whether relief could or could not be afforded in the nature of fixing the terms contemplated by the parties in the event that either party should throw obstacles in the way of its attainment by the means contemplated by the contract.

It is not a practical question between the parties, neither of them, so far as appears, having done any act or made any declaration looking to any dispute as it regards this clause of the contract, and it would be manifestly improper for this Court to anticipate any such controversy at the present time. The whole effect of the decree is to restrain the defendants from unlawful interference with the exercise on the part of the plaintiffs of their contract rights, and to protect a special fund set apart as security for the payment of the amount contracted to be paid by the defendants, and to compel the payment of certain instalments ·already due upon the contract. This can all be accomplished without resort to the provisions of the contract under immediate consideration.

The third exception contains nothing material to the issue between the parties. It is quite immaterial at the present time what was the precise relation created by the contract as between W. Sprague and S. A. Pearce. The plaintiffs, if they have any right to enforce the terms of the contract, unite in themselves all the rights of S. A. Pearce individually and as trustee of W. Sprague, with the individual rights of Sprague, and an inquiry into the original status of W. Sprague is of no value at the present time. The complaint asks nothing for or against W. Sprague individually, and therefore his status under the contract need not be considered. To determine that Sprague had more or less interest under the contract need not affect the question of mutuality raised as to the contract itself, for it would still leave in Pearce an interest and duty adequate to support it.

The fourth exception is merely an amplification of the third, and presents nothing important to be noticed beyond what has already been considered.

The fifth exception objects to the validity of the assignment of the contract by Pearce, for himself, and as trustee for Sprague, to

the present plaintiffs.  Sprague does not object to the assignment as affecting his interest, but, on the contrary, became a party to the assignment itself.  Why the defendants should attempt to raise a question as between Pearce and Sprague affecting no one but those parties, and which they show no disposition to agitate, is not made clear.  This Court cannot treat the case as involving any such controversy, nor the defendants as having any interest whatever in its solution.

The sixth exception is argumentative, and simply summarizes the results which the defendants contend should flow from the preceding exceptions.

The seventh exception argues that the plaintiffs can derive no benefit from the use of the word " assigns " in the contract.  The right of the plaintiffs to bring an action in the nature of a bill in equity on the contract does not depend on the use of the word " assigns " in the contract, but upon provisions of law that will be hereafter considered.  Still the word " assigns " is not without importance as indicating that the parties did not consider the contract as one calling for strictly personal performance by the original contracting party.  The matter of this exception is, therefore, wholly immaterial.

The eighth exception insists substantially that the assignment of the contract destroyed its mutuality.  The question of mutuality, as affecting the right to a specific performance, related to the original character of the obligation assumed.  To say that a contract originally mutual is deprived of that character by the mere fact of assignment is to misconceive the legal meaning of the term mutuality, as applied to contracts.  If the defendants mean that they have lost any rights or remedies that they possessed prior to the assignment, they misconceive the effect of the assignment on such rights and remedies.  This and the next succeeding exception involve, though not distinctly presented, the idea that the contract was not assignable, so as to authorize an action by the plaintiffs to enforce its provisions.  The action is equitable in its nature, and, without the aid of Section 134 of the Code of Procedure, it could be brought by an assignee, where the thing assigned is capable, either at law or in equity, of being assigned.

This Court is entirely satisfied with the grounds upon which the Circuit Judge placed his decision sustaining the right of the plaintiffs to maintain their complaint as assignees.  We are also satisfied.

with the conclusions of the Circuit Judge as it regards the question whether want of complete performance within the time prescribed by the contract is ground for refusing the relief prayed for. It does not appear that the defendants have been in any way preju-diced by any delay that may have occurred in the execution of the contract. To allow the defendants to take possession of the fruits of the plaintiff's labor and expenditures without relief, or to throw them valueless on the plaintiff's hands, is the very evil that the rules of equity were in part framed to prevent. It was to cover such cases that the rule was laid down that time is not of the essence of the contract, and in administering relief of an equitable nature an exception should not be interposed to that general rule, the effect of which will be to do manifest injustice to the parties.

The eleventh exception contains a play of grammatical criticism upon the language of the Circuit Court that might well have been omitted. The expression employed by the Circuit Judge is per-fectly intelligible in a sense consistent with the established rules of construction.

The propositions advanced by the twelfth exception are entirely inadmissible. This Court has nothing to do with the question of the fairness of the price agreed to be paid by the defendants, under the issues raised in this case. The right and authority to determine that matter rested with the City Council. They have fixed the terms of contract, and, unless upon proper issues, it is found to be void, inoperative, or terminated by competent authority, it must be enforced by the Courts without regard to any opinion which they may form as to the fitness of its provisions. We cannot refuse a specific execution of a contract, where otherwise proper, upon any such ground.

We cannot assent to the construction of the terms of the contract advanced by the thirteenth exception. It is forced and unreason-able. The true construction called for an extension and adaptation of the then existing works to accomplish the end in view, namely, a supply of water to the required amount. To duplicate the works requisite to supply the city with water would be a senseless and extravagant expenditure that cannot be assumed to have been the intention of the contract. It is obviously so when it is considered that, as appears, the sources of water supply for the use of the city include water of both a superior and inferior quality, the one derived from springs and the other from the river. That to draw

as much as possible from the best water and a minimum amount from the poorest, is clearly the dictate of prudence. The effect of the construction contended for by the defendants would be to shut out from use a large part of the best of the water available, and to compel resort to impure river water to take its place.

The fourteenth exception simply traces positions previously assumed to their logical consequences, and is already sufficiently disposed of.

The fifteenth exception, in addition to the matters already considered under the last two preceding exceptions, advances a single proposition, that there was a want of compliance with the terms of the contract as it regards providing for the filtration of river water required to be used. On the assumption that the contract only called for the means of filtering such quantity of river water as was required to supply the daily consumption of the city, we concur with the Circuit Court in the conclusion that no want of due performance on the part of plaintiffs or their assignors has been established. The question as to the extent of the means of filtration demanded by the contract arises under the next exception in order.

The sixteenth and seventeenth exceptions take the position that, by the terms of the contract, plaintiffs were bound to construct works and furnish power with an immediate capacity equal to the daily supply of one million five hundred thousand gallons, notwithstanding that a much less amount was actually required for actual consumption, and may be sufficient for many years yet to come. On the other hand, the plaintiffs contend that they are only bound to provide the requisite means to supply the city with all the water required for daily consumption, to an extent not to exceed one million five hundred thousand gallons daily.

The argument in behalf of the defendants rests mainly upon the first clause of the contract, which reads as follows: "That the said party of the second part covenants and agrees to and with the said party of the first part to build such part of a new water works as are required to force one and a half millions of gallons of water daily into the distributing reservoir now used by the city, namely, &c.;" then follows a specification of the details intended to be embraced in the requirement, which concludes as follows: "to furnish a sufficient water power to force into the distributing reservoir the number of gallons of water required by the said city daily." The

city engages to enlarge the present distributing reservoir should it prove insufficient to hold the daily supply requisite for the use of the city.   The contract provides also that the contracting parties shall furnish a filtering apparatus for purifying the water from said river, if such water was required.

It is not disputed that the works constructed and the power supplied are adequate for the immediate wants of the city, and admit of a largely increased consumption.   There can be no doubt that, should the consumption increase, the contracting parties would be bound to provide means, in accordance with the terms of the contract, for supplying such increased demand to the limits of supply called for by the contract.   The construction contended for is, that they were bound to furnish at once, and by the time fixed by the contract, namely, two years from its signature, the full means requisite to supply the maximum amount that, under any circumstances, may be demanded under the contract.

The evidence does not put in doubt the capacity of the works to supply even the maximum amount, except as to the amount of water power provided and the capacity of the filter.   It will therefore only be necessary to look into the question raised so far as it relates to the amount of water power supplied and as to the capacity of the filter.

The special provision of the contract in reference to the amount of water power to be supplied, already cited, and which limits it to the amount required for daily consumption, evidently embodies the intent of the parties as affecting this question.   It is entirely reconcilable with the general clause requiring the erection of works equal to the full capacity of one million five hundred thousand gallons daily.   The general clause embodied the full measure of duty imposed upon the contracting parties under all the contingencies contemplated by the contract, while the special provision furnishes the means of ascertaining the extent of performance due on any particular day or under any given state of circumstances that may arise in the course of executing the contract.

We are of opinion that, unless it is made to appear that there has been a failure on the part of the plaintiffs to supply the amount of water power required to furnish the amount of water required for daily consumption, no want of performance can be maintained.

The clause bearing on the capacity of the filter also has reference to a supply for daily consumption merely.   It provides that the

means of filtration shall be sufficient " for purifying the water from the said river, if such water was required." This clause would not be conditional if the water supply contemplated was the full amount of one million five hundred thousand gallons, for all the evidence shows that that amount could not be supplied without using river water to a large amount. It must be concluded that what was meant by "if such water was required," was that if it was required to supply the daily consumption of the city at any time during the contract. It is clear that the required extent of the means of filtration to be supplied must be determined under the contract by the amount of river water required to make good the amount needed for daily consumption, and not by the maximum amount of one million five hundred thousand gallons.

As we have seen, the special provisions of the contract limit the duty of the plaintiffs, as it regards the supply of water power and the means of filtration, to what is requisite for daily consumption. This view disposes of the whole question without rendering it necessary for us to look into the evidence supporting the conclusion of the Circuit Judge, that, in all respects, the works are sufficient to supply the maximum daily consumption of the one million five hundred thousand gallons.

The view just taken disposes of the eighteenth exception, based upon the sufficiency of the supply of water power to meet the maximum requirements of the contract.

The nineteenth exception does not present very clearly the ground of obligation to the judgment intended to be taken, but, assuming that its object is to reverse the judgment on the ground that the evidence showed that the work was unskillfully performed, we find no ground for disturbing the judgment.

No issue was made in the pleadings as to the character of the work supplied by the plaintiffs as it regards skill of workmanship, and the evidence does not afford any such clear and decisive proof that would justify the interference of this Court with the conclusions of the Circuit Judge on a question of fact.

The twentieth and twenty-first exceptions are fully disposed of by what has already been said.

The exceptions are all insufficient, and the appeal must be dismissed.

*Wright*, A. J., concurred.

MOSES, C. J. I entertain doubts as to the assignable character of the contract. I will not, however, allow them to prevent my concurrence in the judgment of the Court.