## UNITED STATES v. DILLMAN et al.
### No. 11141.

Circuit Court of Appeals, Fifth Circuit.

Dec. 28, 1944.

Rehearing Denied Jan. 26, 1945.

As Amended on Overruling of Motion to File Second Petition April 10, 1945.

Norman M. Littell, Asst. Atty. Gen., S. Billingsley Hill and Vernon L. Wilkinson, Attys., Department of Justice, both of Washington, D. C., for appellant.

Roy Sansing, of Higgins, Tex., and H. H. Cooper, John R. Fullingim, and Grady Hazlewood, all of Amarillo, Tex., for appellees.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

On March 21, 1942, the United States sought by condemnation proceedings to acquire title to 15,000 acres of land together with improvements and growing crops

thereon in Carson County, Texas, for the establishment of the Pantex Ordnance plant. On July 1, 1942, a declaration of taking was filed and the sum of $452,763.00 was deposited with the court as estimated just compensation for the thirty-seven tracts of land and for the improvements thereon. The portion of the deposit allocated to the thirty-one tracts involved in this appeal totaled $429,263.00.

As provided by the Texas statutes, Vernon's Ann.Civ.St.Tex. art. 3264, three commissioners were appointed by the District Court to hold hearings and to value the properties. Thereafter they returned awards of just compensation for all thirty-seven tracts. Objections to their awards totaling $665,566.49 for the thirty-one tracts here involved were filed by the United States and by numerous land owners. As a result, a trial de novo as to those tracts was held in July and August of 1943. A jury was waived by agreement of the parties.

Judgment in accordance with the opinion in the total sum of $783,907.73 for the thirty-one tracts was entered November 18, 1943.

Much evidence was adduced and offered both for the Government and for the defendants. It has covered a wide range. The record contains six volumes with an aggregate of more than 2300 pages.

The opinion of the court, which is a finding of facts and conclusions of law, covers more than one hundred pages. We quote the following excerpt from this opinion:

"Now after this trial was finished—it took nearly a month to hear the evidence—Government's counsel requested me to go out and inspect the land, in which the attorneys, or some of them, for the defendants concurred. I went out this last Saturday and drove entirely around the 15,000 acre tract, on the roads just outside the fences. I also went over the area, making a point to look at every lake which Mr. Rushing had valued as low as $7.50 per acre. As to the water situation, I had in mind Mr. Rushing's picture of 1941 (Rushing was one of the Government's witnesses) taken in the fall, near the end of the biggest rain year in twenty years. Also, that 1942 was a good rain year. Yet there was not a drop of water in a lake in the area, and apparently had not been for a long time. There was water in only one dug tank in the 15,000 acres. I was really amazed at what I saw, compared with what I had heard Mr. Rushing testify. * * * And as I have heretofore indicated, the attorneys requested me to go out there and look at this land, and I went out there, and after what Mr. Rushing said describing the surface of this land I could hardly believe my eyes when I went over the land. In addition to a Government attorney, I had a police sergeant, who knew the entire area, the changes, etc. If there was a rise he would explain if it was made or natural, also if low places were dug outs or natural. So I got a very fair idea of the natural lay of the various areas. I would say, without any doubt, that 14/15 of these 15,000 acres is perfect Panhandle land, certainly for stock farming. There is not as much as 500 acres of lake or lakey land. I knew in reason, the Government had picked it, in part at least, because it was so nearly a generally level area. It is more difficult out there to find a section that is not perfect. That is the truth of the business. Of course, when we say a perfect Panhandle section, we mean in comparison with Panhandle land, not Illinois, Iowa or Georgia land. The whole east side from the Metcalf place as far as you can see from the road, and across the north part were all perfect sections except Deahl's, and for stock raising purposes it is perfect. I know it has on it, say about a ten acre lake, which Mr. Rushing estimated at 40 acres. As I went around and through and checked, by far the most of the sections are perfect. They are there where anybody can go and see them; no need for anybody to be ignorant about it, if they will let them in. And slopes—he cut down ten to fifteen dollars on grass land on slopes and in these lakes. Cattle get there a variety of grasses. They are like we are, they do not like to eat the same thing all the time, if they can get a little change, and particularly where they are all strong grasses. Anybody that knows the least thing about cattle knows that, that these slopes and these lakes, one year after another, are the places where you see the cattle congregate and where they are spending, it looks like, most of their time. * * *."

█ It is not necessary to decide whether it was error or not for the trial judge to go out and inspect the lands, since counsel for the Government invited him to make such inspection. It was prejudicial error, however, to take with him the police sergeant who, it is alleged, was acquainted

with the topography of the lands, and who gave to him information about the lands as they moved over them on inspection.

We have no way of knowing just how accurate this police sergeant was in his explanations to the trial judge wherein he pointed out the high and low places in the lands and informed him how such places were made, whether they had been dug or filled in or were natural. Suppose on a rigid cross-examination it was found that the police sergeant had made a mistake in some of his findings; just what effect would it have had on the finding and decree of the trial judge? We will never know. Were the lands in the same condition as they were when inspected by the witnesses testifying in this case? We will never know. The testimony of the many witnesses as to slopes, grass and lakes and their size and value was possibly sharply contradicted by this police sergeant in the information which he gave. It was information obtained completely outside the record and we are not permitted to know what weight it had with the trial judge.

"What influence the evidence taken outside the hearing, proper or improper, may have had upon the conclusion reached by the commissioner (the trial judge here), or what counter effect cross-examination or rebuttal testimony would have had upon such conclusion, can never be known." Moser v. Mortgage Guarantee Co., 9 Cir., 123 F.2d 423, 425.

The basic elements of a full and fair hearing "include the right of each party to be apprized of all the evidence upon which a factual adjudication rests, plus the right to examine, explain or rebut all such evidence. Tested by that standard, the personal investigation by the conciliation commissioner (the trial judge here) cannot be justified." Carter v. Kubler, 320 U.S. 243, 247, 64 S.Ct. 1, 3.

"The valuation must * * * be determined solely from the evidence adduced at the hearing and the use of evidence obtained in any other manner is improper. * * * And the parties are entitled to a valuation based on a strict adherence to this orderly procedure." Carter v. Kubler, 320 U.S. 243, 246, 247, 64 S.Ct. 1, 3. Moser v. Mortgage Guarantee Co., 9 Cir., 123 F.2d 423; Rhodes v. Federal Land Bank of St. Paul, 8 Cir., 140 F.2d 614, certiorari denied, 322 U.S. 741, 64 S. Ct. 1143.

We quote further from the trial judge's opinion:

"Now before I could ever reach a decision that could be expressed in a judgment, I had to see the commissioners. I took a Government attorney with me and saw them Saturday. * * * I asked the commissioners what method they used in arriving at a crop value, and found that they did not use the proper method. They took the AAA records of the average production of these farms over a period of ten years. Those average productions in this area were 7½ to 11 bushels. Where it was 7½ they would double that and make the yield 15 bushels, and where it was 11 they would make it 22. They added some because of the better prospects for 1942, without depreciation. This is not the proper way to value a crop at all. It must be valued on prospects at the date of the taking, or around that time, as long as conditions remain the same, and then depreciate on the basis of allowable hazards, and the expenses of harvesting. Crop harvesting, elevator expenses, etc. As to volunteer wheat, they estimated that on a history basis of comparative yields of volunteer and seeded wheat. Because volunteer generally produces less, they gave it an arbitrary 15 per cent reduction as compared to seeded wheat. They also figured excess wheat at 57¢, most of it volunteer, which was also an error. These were right serious errors against the condemnees. * * * As to their land values, I think they were on an average per acre around $2.50 low. In my judgment, their error on land, improvements and crops, runs around 17%; their percentage of error on crops alone, with their depreciation, around 50%. Their percentage of error on lands and crops about 20%. Their percentage of error on land about 7%. It can be seen that no general percentage of error can be used and applied to every condemnee. This is obvious, because, for example, of the 50% error as to crops. Some have only crops and some have only land; some have land, improvements and crops, and some have just land and crops. It cannot be stated with exactness, of course, but on the basis of error just detailed, the net result would be about this: And that applies to the 31 tracts, a number of them having been compromised. The commissioners allowed around $640,000.00. My award will increase that about $123,000.00. Over the Government's tender to condemnees, my

award will increase that about $350,000.00. I do not know anything about any efforts to compromise. Taking the Government's pleadings for it, it will be an increase of about $350,000.00 over what the Government had offered these people. * * *."

█ Certainly the trial judge had the right and it was his duty to take up and consider, along with all the evidence in the case, the sworn report of the commissioners as found in the record, but when he went to interview the commissioners about their report, it was error. Here again, no opportunity was given counsel for both sides to examine and cross-examine the commissioners or to offer evidence by way of rebuttal to their statements. The trial judge was in possession of information which he had obtained from the commissioners, from a personal inspection of the lands, and from an interview with the police sergeant, yet not one shred of this information is to be found in the record.

█ Moreover, the trial judge casts up the amounts of the different awards made by the commissioners, and uses them, we think, as a predicate or foundation upon which to find and render his judgment. This was not a hearing de novo. It leaves to speculation and conjecture just how much his decision was influenced by this interview with the commissioners. What he found from this interview, what each of the commissioners told him, and what weight it had with him, we are not permitted to know. It is no part of the record. We only know he differed from the commissioners and pointed out, after his interview, many errors which he alleges they had made. Carter v. Kubler, 320 U.S. 243, 247, 64 S.Ct. 1; Moser v. Mortgage Guarantee Co., 9 Cir., 123 F.2d 423, 425.

█ With the order of taking the Government deposited for the thirty-one tracts of land here involved the sum of $429,263.-00. The commissioners thereafter found the value to be $665,566.49, and the trial judge raised this amount to $783,907.73. In view of the vast amount of illegal evidence found in the record touching offers to buy and offers to sell parts of this and adjacent land, we are not willing to say that this amount was the reasonable market value of this property. This evidence was clearly erroneous.

"An opinion, however, largely based on owner's asking prices ought to be rejected, for the courts have decided that even offers by buyers are too unreliable to be considered." Atlantic Coast Line R. Co. v. United States, 5 Cir., 132 F.2d 959, 963. Sharp v. United States, 191 U.S. 341, 348, 24 S.Ct. 114, 48 L.Ed. 211.

For the errors pointed out the judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

SIBLEY, Circuit Judge (dissenting).

While the trial appears to have been irregular, and the atmosphere of it charged with feeling, I do not think the errors pointed out by the majority are reversible ones. Counsel for the government invited the judge to view the premises, and one of them was present when the view was made, and the information, whatever it was, given by the sergeant. If the sergeant said anything amiss, this counsel could have cross-examined him then and there, or asked later that the trial be reopened, and the sergeant examined regularly under oath. A counsel for the government was also present when the commissioners were interviewed, and made no objection. The judge differed altogether from the commissioners on the matters he discussed with them, so the interview had no effect on him. His percentages of error were not used by him in his findings, and were apparently mentioned only to show how far wrong he thought the commissioners were in their ideas. The evidence as to offers, as evidence of value, were not objected to, and both sides offered much that might have been excluded in a more careful trial. The figures reached by the judge are well within the sworn evidence properly admitted.

On Application to File Second Motion for Rehearing.

PER CURIAM.

The application of appellees to recall the mandate, to amend the record of the trial court, and for permission to file a second petition for rehearing, is overruled; but the opinion of this court filed December 28, 1944, is amended so that the first sentence of paragraph [4], p. 575, shall read as above.