SAEED MORAD vs. ANTONIO SILVA & others.

Bristol.    October 26, 1953. — January 29, 1954.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, & WILLIAMS, JJ.

*Equity Jurisdiction*, Specific performance. *Contract*, For sale of real estate,
    Consideration, Sealed contract.

Under G. L. (Ter. Ed.) c. 4, § 9A, an agreement containing a recital that
    it was executed under seal had the effect of a sealed instrument and
    want of consideration was of no avail as a defence to its enforcement.
    [98]
The fact that the remedy of specific enforcement of a contract is not
    available to one party to it is not a sufficient reason for refusing that
    remedy to the other party. [99]
A mortgagee who, while foreclosing his mortgages, entered into a sealed
    contract to sell the mortgaged property in the event that it was not
    redeemed from the foreclosures and that he became the purchaser
    thereof at the foreclosure sales, and who subsequently acquired the
    equity of redemption in the property from a trustee in bankruptcy,
    was entitled, in a suit in equity against the prospective buyer under
    such contract, to a decree ordering specific performance by the de-
    fendant conditional on concurrent performance by the plaintiff. [99–
    100]
In a suit in equity by the seller against the purchaser under a sale and
    purchase contract requiring the plaintiff, who was not the owner of
    the property in question at the time of making the contract, to trans-
    fer title thereto "as soon as legally possible . . . after he acquires
    title thereto," a delay by him in tendering performance for more than
    a year after his acquisition of title did not bar him from securing relief
    by specific enforcement of the contract where it appeared that he
    "acted with due diligence . . . under the circumstances" and that the
    delay, caused principally by a dispute between him and his attorney
    as to the amount of the attorney's fee for services, "was acquiesced
    in and agreed to" by the defendant, who was obligated by the con-
    tract to pay such fee as a part of the purchase price. [100]

BILL IN EQUITY, filed in the Superior Court on June 4,
1951.

The suit was heard by *Sullivan, J.*, upon a master's report.

*Solomon Rosenberg*, for the defendants Antonio Silva and
another.

*Gerald P. Walsh*, for the plaintiff, submitted a brief.

SPALDING, J.  The object of this bill in equity is to compel specific performance of an agreement for the purchase and sale of a parcel of real estate and certain personal property.  The defendants are Edward Sylvia, and Antonio and Rebecca Silva, husband and wife.  Inasmuch as all the appeals here involved were taken by the defendants Antonio and Rebecca Silva, they will be referred to hereinafter as the defendants.  The defendants demurred to the bill, and from an interlocutory decree overruling the demurrer the defendants appealed.  Thereafter the case was referred to a master and his report was confirmed by an interlocutory decree which also overruled numerous exceptions to the report.  Although the defendants appealed from this decree we do not consider it, as neither the question of confirmation nor the exceptions have been argued.  Nor, for the same reason, do we pause to consider the demurrer.  We pass, therefore, to the defendants' appeal from the final decree, which granted specific performance.

The pertinent findings of the master are these.  On September 16, 1949, the plaintiff and Edward and Antonio entered into an agreement for the purchase and sale of a funeral home situated at 512 North Front Street, New Bedford, together with certain personal property which had been used in conjunction with the home.  Edward and Antonio intended to conduct a funeral home on the premises and are sometimes hereinafter referred to as the purchasers.  At the time the agreement was made the funeral home and personal property were owned by Antone J. and Lillian R. Anthony.  Their ownership of the real estate, however, was subject to a first mortgage to the New Bedford Co-Operative Bank and to a second mortgage to the plaintiff.  The plaintiff also held a chattel mortgage on the personal property.  The agreement, after reciting that the plaintiff was foreclosing the real estate and chattel mortgages on the property, further provided that the plaintiff agrees to sell "In the event that said Anthonys do not redeem said foreclosures and that . . . [the plaintiff] becomes the purchaser of . . . [the] property at said foreclosure sales or

any adjournment . . . thereof." Steps were taken by the plaintiff to foreclose the Anthony mortgages but before the proceedings were completed the Anthonys brought a bill in equity to enjoin the foreclosures. The outcome of this suit does not appear but that is of no materiality because shortly thereafter Anthony became a bankrupt, and on January 19, 1950, the plaintiff purchased the equity of redemption of both the real and the personal property from the trustee in bankruptcy.

The purchase price stipulated in the agreement between the plaintiff and the purchasers was "such an amount as will repay . . . [the plaintiff] the amounts of the balance due . . . [him] under . . . [the Anthony] mortgages plus interest, attorney's fees, payments made by . . . [the plaintiff] to any senior mortgagee . . . and any and all other expenses connected with said foreclosures or incidental thereto," but in no event was the total price to be more than $22,000. The sale was to be subject to the first mortgage to the New Bedford Co-Operative Bank and to all taxes and assessments to the city of New Bedford. The plaintiff was to transfer title to both the real and the personal property "as soon as legally possible for him to do so after he acquires title thereto," and the purchasers were to pay for the property by giving back to the plaintiff a second mortgage on the real estate and a first mortgage on the personal property. At the time the purchase and sale agreement was signed Rebecca Silva, Antonio's wife, gave to the plaintiff a first mortgage on a parcel of real estate in Mattapoisett of which she was the owner "as security for the performance of the conditions, covenants and agreements by the purchasers in the mortgages to be given . . . to . . . [the plaintiff]."

After the plaintiff acquired the Anthonys' equity of redemption from the trustee in bankruptcy on January 19, 1950, as above stated, he gave the trustee's deed to his attorney, Mr. Peltz, and instructed him to prepare the necessary papers to carry out the purchase and sale agreement. During the following week there were several con-

ferences between the parties touching various aspects of the agreement, including the final sum to be paid for the property, which up to that time had not been established. On or about January 27, 1950, the "final figure" of $18,400, plus Mr. Peltz's fee, was agreed upon by the plaintiff and the purchasers. Thereafter Mr. Peltz told the plaintiff what his fee was going to be and the plaintiff stated that he would not pay it. Mr. Peltz then told the plaintiff that he would not surrender the deed until his bill was paid. The plaintiff later told the purchasers that the fee was exorbitant and he would not pay it unless they, who under the agreement were to bear this expense, authorized him to do so. The purchasers agreed that the fee should not be paid. At the same time the plaintiff suggested to the purchasers that they enter and operate the funeral home in accordance with the agreement and in the meantime he would attempt to have the fee reduced. The purchasers assented to this suggestion and on February 1, 1950, Antonio and Rebecca moved into an upstairs apartment in the home. The property was operated by Antonio and Edward as a funeral home from that date until October 25, 1950, when, as a result of a disagreement between them, Antonio and Rebecca moved away. Since that time Edward has continued to operate the home.

In the meantime the plaintiff had been trying, without success, to obtain the deed from Mr. Peltz. On February 23, 1951, after extended negotiations, Mr. Peltz delivered the deed to the plaintiff upon receiving from him a bond to secure whatever he (Peltz) might recover in an action for his fee. The plaintiff "acted with reasonable diligence to obtain the deed from Peltz short of paying the fee he demanded." "The delay encountered by the plaintiff in obtaining the deed of the funeral home was acquiesced in and agreed to by all the defendants." Shortly after the plaintiff obtained the deed from Mr. Peltz he tendered performance, without success, to both Antonio and Edward. Upon the constituent facts found by him and upon "all

the evidence in the case" the master concluded that "the defendants have failed to perform their part of the agreement without legal justification and that the plaintiff has fully performed his undertakings under the agreement . . .."

There was no error.

1. It is argued that the plaintiff's promise was illusory in that he was not bound to continue with the foreclosure of the Anthony mortgages or to become the purchaser at the foreclosure sales. Hence, it is said, this promise was insufficient consideration for the purchasers' promise. The short answer is that the agreement, by reason of the recital that it was under seal, was in legal effect a sealed instrument (G. L. [Ter. Ed.] c. 4, § 9A; *Tupper* v. *Hancock,* 319 Mass. 105, 107) and want of consideration is of no avail. *Lawrence H. Oppenheim Co.* v. *Bloom,* 325 Mass. 301.

2. The defendants argue that specific performance should be denied because "there was no mutuality of obligation." But mutuality of obligation is of importance only in determining whether a valid bilateral contract, founded on good consideration, has been entered into. See *Bernstein* v. *W. B. Manuf. Co.* 238 Mass. 589. Strictly speaking, it has no bearing on the question of whether specific performance should be granted. It is true that expressions may be found in some of the cases to the effect that equity refuses specific performance where there is no mutuality of obligation. See, for example, *Putnam* v. *Grace,* 161 Mass. 237, 247; *Forman* v. *Gadouas,* 247 Mass. 207, 214. But what is really meant by such statements is that there is no mutuality of remedy. The distinction between mutuality of obligation and mutuality of remedy has not always been observed in the decisions. Williston, Contracts (Rev. ed.) § 1433.

The doctrine that there must be mutuality of remedy at the time the contract is entered into or specific performance will be denied has been much criticized and the great weight of modern authority has repudiated it. Ames, Mutuality in Specific Performance, 3 Colum. L. Rev. 1. Cook, The Present Status of the "Lack of Mutuality"

Rule, 36 Yale L. J. 897. Williston, Contracts (Rev. ed.) §§ 1434–1440, and authorities there collected. As a distinguished judge has said in a leading case, "If there ever was a rule that mutuality of remedy existing, not merely at the time of the decree, but at the time of the formation of the contract, is a condition of equitable relief, it has been so qualified by exceptions that, viewed as a precept of general validity, it has ceased to be a rule to-day . . . . What equity exacts to-day as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to plaintiff or to defendant." Cardozo, J., in *Epstein* v. *Gluckin*, 233 N. Y. 490, at pages 493–494.

The modern rule is that "The fact that the remedy of specific enforcement is not available to one party is not a sufficient reason for refusing it to the other party." Restatement: Contracts, § 372 (1). The trend of our decisions is not at variance with this rule and we accept it as the law of this Commonwealth. *Old Colony Railroad* v. *Evans*, 6 Gray, 25, 33. *Dresel* v. *Jordan*, 104 Mass. 407. *O'Brien* v. *Boland*, 166 Mass. 481, 483. *Howe* v. *Watson*, 179 Mass. 30, 39–40. *French* v. *Boston National Bank*, 179 Mass. 404, 408. *Boston & Worcester Street Railway* v. *Rose*, 194 Mass. 142, 149. We are mindful that there is language in a few of our decisions which tends to support the mutuality doctrine. See, for example, *Putnam* v. *Grace*, 161 Mass. 237, 247; *Freeman* v. *Fishman*, 245 Mass. 222, 227; *Forman* v. *Gadouas*, 247 Mass. 207, 214. To the extent that these decisions can be considered authority for the doctrine we are not disposed to follow them.

Of course, even under the rule which rejects the mutuality principle specific performance may be refused "if a substantial part of the agreed exchange for the performance to be compelled is as yet unperformed and its concurrent or future performance is not well secured to the satisfaction of the court." Restatement: Contracts, § 373. Williston, Contracts (Rev. ed.) § 1440. *Barrell* v. *Britton*, 258 Mass. 383, 387. *Strumskis* v. *Tilenas*, 268 Mass. 550, 553. *Ep-*

*stein* v. *Gluckin*, 233 N. Y. 490, 493. *Daniels* v. *Brown Shoe Co. Inc.* 77 Fed. (2d) 899, 901 (C. C. A. 1). But there is no difficulty of that sort here, for the decree fully protects the purchasers by making performance on their part conditional on concurrent performance in full by the plaintiff. *Rigs* v. *Sokol*, 318 Mass. 337, 344. We have discussed the mutuality doctrine at considerable length because, despite the fact that most of our decisions are in harmony with the modern rule, the ghost of mutuality still walks and, until laid, will continue to haunt our law.

3. Under the agreement the plaintiff promised to perform "as soon as legally possible" after he acquired title to the property in question. The defendants contend that the plaintiff's delay in performing did not meet this requirement and bars him from relief. That a considerable period of time elapsed between the acquisition of title to the property by the plaintiff and his tender of performance cannot be gainsaid. But the master found that the "plaintiff acted with due diligence . . . under the circumstances" and that the delay "was acquiesced in and agreed to by all the defendants." We cannot say in view of these findings that the plaintiff ought not to prevail.

We have discussed the principal questions argued by the defendants. Other points relied on by them, but not discussed in this opinion, have not been overlooked. We find nothing in them that requires discussion.

<div align="right">

*Interlocutory decrees affirmed.*
*Final decree affirmed with costs*
*of appeal.*