HUMBLE OIL & REFINING COM-
PANY, Plaintiff,

v.

Mac R. DeLOACHE, Dorothy R. Hulsey,
Hazel R. Jewell, and Evelyn R. Martin
(heirs at law and sole distributees of
William Thomas Ridgeway, deceased)
and Dorothy R. Hulsey (Administratrix
of the Estate of William Thomas Ridge-
way, Deceased), Defendants.

Civ. A. No. 67-722.

United States District Court
D. South Carolina,
Columbia Division.

Feb. 20, 1969.

Francis P. Mood, Boyd, Bruton, Knowlton & Tate, Columbia, S. C., for plaintiff.

Henry Hammer, Columbia, S. C., James M. Herring, Saleeby, Saleeby & Herring, Hartsville, S. C., A. Lee Chandler, Darlington, S. C., Isadore S. Bernstein, Columbia, S. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

DONALD RUSSELL, District Judge.

This action for specific performance of two written options for lease of certain properties adjacent to the intersection of State Highway 261 and Interstate Highway 95, under construction, and located in Clarendon County, South Carolina, some five (5) miles from the Town of Manning, was tried before me without a jury at a term of Court held in Columbia, South Carolina, on November 18 and 19, 1968.

One of the sites covered by an option to lease was a filling station site, 200 x 200 feet, beginning at the control access point on the southwestern corner of the intersection. The other separate option embraced a strip 10 x 1000 feet, running east from the filling station site to a sign site on Interstate Highway 95, together with the sign site itself, 40 x 50 feet. The lease options were between the plaintiff, as lessee, and William Thomas Ridgeway, as lessor-owner. Prior to notice by plaintiff of intention to exercise the two options, Ridgeway was killed in a boat accident on Lake Marion, near Manning. He died intestate. The defendants are his heirs-at-law. One of such heirs, Dorothy R. Hulsey, is, also, the Administratrix of his estate and is made a party defendant in that capacity as well as individually. The defendants-heirs, acting through the defendant Administratrix, have refused to comply with the options, thereby prompting the filing of this action.

## JURISDICTION

There is diversity of citizenship between the plaintiff and all of the defendants. The subject-matter of this action is located in Clarendon County in the District of South Carolina. The amount in controversy, involved in the two lease options, is in excess of $10,000, exclusive of interest and costs.[1] There is, accordingly, jurisdiction in this Court over the controversy. Massie v. Watts (1810) 6 Cranch 148, 160, 3 L.Ed. 181; Davis v. Davis (C.C.Mont.1898) 89 F. 532, 537; American Surety Co. of New York v. Baker (C.C.A.Fla.1940) 112 F.2d 686, 688.

## BACKGROUND OF CONTROVERSY

The circumstances leading up to the execution of the two lease options are relatively undisputed. The intestate acquired a farm, of which the areas embraced in the two lease options were a part, by devise from his father. After the location of Interstate Highway 95 through such farm, the intestate recognized the suitability of his corner site as a filing station site. In developing such site, he determined to seek a satisfactory long-term lease rather than to effect a sale. He preferred the guaranteed security of monthly rental payments by a responsible lessee and the avoidance of a capital-gains tax, to the responsibility, with its hazards, involved in seeking profitable and stable investment of the proceeds of a sale, diminished by the capital-gains tax.

---

1. In a suit for specific performance, the amount in controversy is the value of the property involved. Ebensberger v. Sinclair Refining Co. (C.C.A.Tex.1948) 165 F.2d 803, 805, cert. den. 335 U.S. 816, 69 S.Ct. 35, 93 L.Ed. 371. The value of the lease herein would be many times the jurisdictional amount.

The intestate first offered a lease of the filling station site to Gulf Oil Corporation. Gulf was represented by Mr. W. C. Langford in the negotiations that followed and the intestate represented himself. No one else participated directly in the negotiations. The option lease, as finally negotiated between the parties, contemplated a monthly rental of $300. Gulf, however, refused to exercise the option, regarding the rental too high. It did counter with an offer to buy the site for $44,000, but, for the reasons already outlined, the intestate was interested only in a lease, not a sale, and he declined the offer of Gulf to buy.

Rebuffed by Gulf, the intestate retained Joe Bates Harvin, a licensed realtor in Manning, to secure from a responsible lessee an acceptable lease of the site. Preparatory to approaching a prospective lessee, Mr. Harvin and the intestate agreed upon a fair valuation of the site as a basis for fixing a proper rental. After reviewing comparable locations in the general area, they arrived at a value of $40,000 for the one-acre site and a monthly rental providing a return of six per cent thereon, or $200 per month.

Harvin, acting on behalf of the intestate, first approached the Sinclair Refining Company, offering it a long-term lease on the filling station site at a monthly rental of $200. The management of Sinclair, feeling the rental too high, declined the offer. Only after Sinclair had refused to lease the property did Harvin approach the plaintiff, suggesting the same rental terms he had submitted to Sinclair. A conference was set up between Mr. J. F. Riddle, representing plaintiff, and Mr. Harvin and the intestate at Manning on February 22, 1967. At this conference, Mr. Riddle submitted the two lease options which are the subject-matter of this suit. Mr. Riddle read and explained the terms of the two option leases to Mr. Harvin and the intestate and answered such questions as were raised by either.[2] The intestate indicated he wished to consider further the contracts. This was agreeable to Mr. Riddle. The lease options were thereupon left with Mr. Harvin, available to the intestate at any time. It was suggested by Mr. Riddle as the conference ended, that the intestate should consult his attorney with reference to the lease options. On March 6, 1967, twelve days after his conference with Mr. Riddle, the intestate discussed with his attorney, Marion Riggs, Esquire, an experienced and respected member of the Manning Bar, the proposed lease options. After receiving and considering Mr. Riggs' advice (which, incidentally, was adverse but not on account of any inadequacy in the rentals), the intestate went to Mr. Harvin's office, signed the two lease options and accepted the cash consideration provided in the options.[3]

Between the conference on February 22 and the execution of the lease options by the intestate, no representative of the plaintiff had communicated with the intestate or sought to influence his decision in any way.

On April 30, following the execution of these options, the intestate was killed in a boat accident.

By registered letter dated June 13, 1967, and received by the defendant Administratrix on either June 14 or June 16, the plaintiff duly notified the defendants of the exercise of its options in accordance with the terms, and within the time allowed for the exercise, thereof. The defendant Administratrix, acting on

2. It is to be noted that the second option for a lease of the sign site included a lease of a narrow strip from the station site to the actual sign site, along which could be laid a service connection for the sign. The strict wording of this second lease looked to a lease of the fee for this strip, but, as construed and explained by Riddle, acting for the plaintiff, to the intestate and Harvin, it contemplated only an ease- ment over this strip. Such was the understanding of the parties. I have so construed this second option and limited the second lease accordingly. Thus limited, the second lease expressed the understanding of the parties.

3. The consideration paid the intestate for the option on the filling station site was $300 and on the sign site $1.00.

behalf of herself and the other defendants, advised the plaintiff, by letter dated June 18, 1967, of their refusal to comply with the options. This suit followed.

## ISSUES RAISED BY THE DEFENDANTS

■ It is conceded that an option to lease or to convey, based on a valuable consideration, may be specifically enforced. See, Corbin on Contracts, vol. 5A, p. 372; Willard v. Tayloe (1869) 8 Wall. 557, 567, 75 U.S. 557, 567, 19 L.Ed. 501; Sinclair Refining Co. v. Miller (D. C.Neb.1952) 106 F.Supp. 881, 885. The defendants, however, relied on the following grounds enumerated in their proposed Findings of Fact herein, as justification for their refusal to comply with the options and as a basis for denial of the right of specific performance in this case: (1) mental incompetency on the part of the intestate; (2) invalidation of the options by the failure of the plaintiff to make rental payments as required under the leases; (3) gross inadequacy of consideration; (4) hardship; (5) lack of mutuality of remedy in the leases; and (6) indefiniteness in the terms of the leases.

## GENERAL RULE FOR SPECIFIC PERFORMANCE

■ Since the leases were executed in South Carolina, the subject of the leases is located in South Carolina and the essential acts of performance must take place in South Carolina, the law of South Carolina should control on the rights of the parties in this proceeding. Alameda County v. United States (C.C.A.Cal.1941) 124 F.2d 611, 614; Sinclair Refining Co. v. Miller, supra, p. 885 (106 F.Supp.). The holding to the contrary in Guffey v. Smith (1915) 237 U.S. 101, 114, 35 S.Ct. 526, 59 L.Ed. 856, preceded the decision in Erie R. Co. v. Tompkins

(1938) 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. See, note, 22 A.L.R.2d 573. However, the issue of State versus federal law in this case is unimportant, as it does not appear that the rules are different in the two jurisdictions.

■ It is often stated in the South Carolina decisions that the right to specific performance is "not a matter of absolute right, but rests in the sound discretion of the Court". Masonic Temple, Inc. v. Ebert (1942) 199 S.C. 5, 20, 18 S.E.2d 584, 590. Such discretion, however, "is not an arbitrary or capricious one, but a judicial discretion, to be exercised in accordance with the special rules and practices of equity, and with regard to the facts and circumstances of the particular case (citing the *Ebert case*). It was never intended to substitute the judgment or business sagacity of the chancellor for that of the contracting party and to relieve one of a supposed bad bargain when fairly entered into." Holly Hill Lumber Co., Inc. v. McCoy (1942) 201 S.C. 427, 445–446, 23 S.E.2d 372, 380 (same case 205 S.C. 60, 30 S.E. 2d 856, cert. den. 323 U.S. 778, 65 S.Ct. 191, 89 L.Ed. 621; 207 S.C. 428, 36 S.E. 2d 140); Adams v. Willis (1954) 225 S.C. 518, 527, 83 S.E.2d 171; New v. Collins (1923) 126 S.C. 294, 296–297, 119 S.E. 835; Dunlop v. Baker (C.C.A. Va.1916) 239 F. 193, 197; McCargo v. Steele (D.C.Ark.1958) 160 F.Supp. 7, 19, aff. 260 F.2d 753; Sims v. Nidiffer (1962) 203 Va. 749, 127 S.E.2d 85, 87. Where the agreement, be it an option, lease or contract of sale, is unobjectionable and is regular and valid, it, as the Court remarked in Sims v. Nidiffer, *supra*, "is as much a matter of course for a court of equity to decree specific performance of it as it is for a court of law to award damages for its breach." (127 S.E.2d at page 87.)[4]

4. Cf., Citation by Mr. Chief Justice Stone, in his article in 16 Colum.L.Rev. 443, at pp. 463–4, "The Mutuality Rule in New York", of Mr. Justice Romer in Biggs v. Hoddinott (1898) 2 Ch. 307, 313: "There is a great principle which I think ought to be adhered to by this court and by every court where it can possibly do so; that is to say that a man shall abide by his contracts and that a man's contracts should be enforced as against him."

## DISCUSSION

It is accordingly necessary that the objections raised by the defendants to plaintiff's right to specific performance be considered and resolved not by any arbitrary discretion but in accordance with recognized principles of equity. The objections of the defendants will be considered *seriatim* in the light of such recognized principles of equity.

### I

The first ground urged by defendants for denial of specific performance is the alleged incompetency of the intestate. To support this plea, the defendants relied on the testimony of three witnesses. The first was Mrs. Dorothy R. Hulsey, a sister of the intestate and the Administratrix of his estate. According to her testimony, the intestate was retarded mentally from birth, was late in learning to talk, had great difficulty in school, and became a "drop-out while in the fifth-grade." She discounted the circumstance that her father had not trusteed but, on the contrary, had devised "outright" the farm to the intestate, thereby evidencing a belief on his (the father's) part in the capacity of the intestate to manage his property. She testified that the father, however, expected her to advise and guide the intestate in all business matters. She claimed that she did advise and guide the intestate in his farming operations following the father's death. All the records of operations were kept by her and she prepared for the intestate all checks issued by him. She also was consulted by her brother, she said, during his negotiations with Gulf, though she did not actually participate in any of the direct negotiations.

Dr. A. C. Bozard was the second witness for the defendants on this issue. He is a practicing physician, engaged in a general practice, in Manning. He had occasionally treated the intestate, on one occasion for a respiratory condition, and on the others for alcoholism.[5] Other than these professional visits, Dr. Bozard had only a nodding acquaintanceship with the intestate. He made no psychiatric examination of the intestate; his opinion of the intestate's mental capacity was thus more a lay than a professional opinion. He based his conclusion that the intestate was mentally incompetent on the intestate's misuse of English and on a report of his school work as secured by him the day before he testified (and apparently as a predicate for his testimony) from one of the long-time teachers at the school the intestate attended.[6]

The final witness for the defendants was the intestate's employment supervisor at the time of his death. The intestate was engaged in servicing a large number of automatic food-serving establishments. Included in his duties was the responsibility of making repairs or adjustments when any of the food-serving machines became inoperative. His supervisor testified that the intestate was not adept and showed little initiative in making such repairs. He conceded, however, that the intestate was a satisfactory employee and was about on a par in ability and mental competence with others similarly employed by him.

Over against this testimony, the plaintiff cited the fact that the father, whose opportunity for observing the mental capabilities of the intestate was superior to anyone else, had felt the intestate was perfectly competent to take care of his

---

5. It should be observed that no contention is made that any mental disability or weakness stemmed from such alcoholic problems as he may have had. It is undisputed that the intestate was perfectly sober on February 22, when he reviewed the option leases with Mr. Riddle, and on March 6, when he executed them. Nor is there any evidence that at any time during the period of these negotiations had he indulged in any drinking or was laboring under any mental difficulty because of alcoholism.

6. Cf., Mathias v. Mathias (1945) 206 S.C. 276, 281, 33 S.E.2d 626, where the Court dealt with opinion testimony of physicians not qualified as alienists on the issue of mental competency and found it "to be without important value" on the issue.

affairs, otherwise, he would have trusteed the devise to the intestate. Moreover, the intestate had been found mentally competent both for induction and for service, until honorably discharged, for two years in the Army. Mr. Langford, with whom the intestate negotiated the Gulf option, found the intestate perfectly competent mentally to take care of his interests in the negotiations of the option; in fact, he emphasized that the intestate "drove a hard bargain." The representatives of both Sinclair and the plaintiff were of the opinion the intestate was mentally competent to handle his affairs and able to understand thoroughly the negotiations had with him. More significantly, when the intestate talked to Mr. Riggs, he discussed in detail the terms of the lease options, evidencing that he clearly understood the nature, terms and effect of the instruments. Mr. Riggs, who had known the intestate for many years, also testified that he thought the intestate mentally competent. Mr. Harvin, who necessarily had considerable opportunities to observe the intestate, was of the opinion that the intestate comprehended the details of the lease options and evidenced the competency to protect his interests.

█ The rule as to mental competency under the laws of South Carolina is authoritatively stated in Du Bose v. Kell (1911) 90 S.C. 196, 207, 71 S.E. 371, 376, where the Court stated:

> " ' * * * while the mental incapacity which will render one unable to make a contract or a valid gift need not be so great as entirely to dethrone the reasoning powers, there must be at the time of the act or contract such insanity or mental weakness or unsoundness as amounts to an incapacity or occasions an inability to understand or comprehend the subject of the contract or act and its nature and probable consequences, in order to render the act or contract void in law. * * ' "

To the same effect: Mathias v. Mathias (1945) 206 S.C. 276, 280, 33 S.E.2d 626; Avant v. Johnson (1957) 231 S.C. 119, 132, 97 S.E.2d 396; Blanford, Exrx. v. Mauterer (S.C.1969), 165 S.E.2d 633 (decided January 28, 1969); Koebig v. South Carolina National Bank of Charleston (C.C.A.S.C.1954) 217 F.2d 713, 716; and Schenck v. Going (C.C.A.S.C.1956) 237 F.2d 251, 253.

█ Measuring the evidence in this case, including the demeanor of the witnesses, by this rule, I am of opinion that the intestate was fully competent to understand and comprehend, and did understand and comprehend, the nature and effect of the two lease options he executed as explained by Mr. Riddle. He evidenced such understanding in his conversation with Mr. Riggs. He had demonstrated in other negotiations such understanding as well as the ability to represent adequately his own interests. He did so in the negotiations with Gulf. Though Mrs. Hulsey stated he consulted her about these negotiations, he—*and seemingly Mrs. Hulsey, too*—thought him perfectly competent to conduct the lease negotiations with Gulf and to understand the obligations he was undertaking. He himself concluded he was able to handle the settlement for right-of-way through his property without Mrs. Hulsey's advice. He chose his own lawyer and made his own settlement. No evidence, other than Mrs. Hulsey's expression of dissatisfaction, was offered that the intestate, with the assistance of his attorney, did not secure a fair settlement for such right-of-way. Moreover, in determining upon a lease rather than a sale—in the reasons expressed by him for such determination—the intestate showed an ability to consider rationally and logically his interests and *to reach a thoughtful conclusion.* It is inconceivable, too, that he would have been accepted for military service and permitted to serve his full term, if he had been mentally incompetent. The mere fact that he lacked grammatical proficiency certainly was no index to his mental competency; such a rule could make imbeciles of many intelligent persons.

**654**

## II

The second ground raised by the defendants merits little attention and is patently untenable. When the defendants, acting through Mrs. Hulsey, advised the plaintiff in writing that they refused to comply with the lease options, the plaintiff was excused from going through the useless formula of tendering to the defendants the monthly payments that became due under the leases. As the Court said in Shannon v. Freeman (1921) 117 S.C. 480, 487–488, 109 S.E. 406, 409:

> "Where a vendor repudiates the contract, or where it is evident from all the circumstances that tender would have been unavailing, a court of equity will not hold a vendee barred of his right to specific performance by reason of his failure to make tender (citing cases). * * * The basis for the rule is that equity will not require the doing of a useless thing, nor foreclose the rights of the party for failure to do something which in view of all the facts the court finds would have been useless."

See, to the same effect: McCall Co. v. Hobbs-Henderson Co. (1927) 138 S.C. 435, 440, 136 S.E. 762; Loveless v. Diehl (1962) 235 Ark. 805, 236 Ark. 129, 364 S.W.2d 317, 321; Finney v. Blalock (1950) 206 Ga. 655, 58 S.E.2d 429, 433; Todd v. Bivins (1959) 215 Ga. 402, 110 S.E.2d 768, 772; and Lissau v. Smith (1958) 215 Md. 538, 138 A.2d 381, 385.

## II

To warrant denial of specific performance, inadequacy of consideration, must be "palpably disproportioned to the real and market value of the property, so as to constitute a hard, unreasonable, and unconscionable contract; but it is not necessary that it should be so gross as to excite an exclamation or indicate imposition, oppression or fraud, for this would be sufficient ground not only for refusing a specific performance but for rescinding the contract." Gasque v. Small (1848) 2 Strob. Eq. 72, 80. Or, as Mr. Justice Woods put it in Coley v. Coley (1913) 94 S.C. 383, 386–387, 77 S.E. 49, 50, "courts of equity have uniformly refused to enforce, or have given affirmative relief against, contracts so unequal and unconscionable as to shock the sense of right of reasonable men."

The defendants rest their charge of gross and unconscionable inadequacy of consideration upon the testimony of three witnesses. Mr. Fred McMurray, an experienced real estate appraiser, after making a number of comparisons with comparable sales and leases, gave a value of $55,000 to the filling station site and a reasonable rental value of $400.00, fixed as of the date of the lease option. Mr. G. C. Heaton, who is not a real estate appraiser but is engaged in dealing in corner sites along Interstate Highway 95, valued the site involved in this action at $60,000. Moreover, Mr. Heaton purchased lots, not greatly different from the one in question, at prices below his valuation of the property involved in these options. It would seem that Mr. Heaton's valuations depended upon whether he was buyer or seller. The final valuation witness for the defendants was Mr. Lamar Bagwell, Sr., a real estate salesman specializing in seeking sales along developing interstate highways. He did not seek to qualify as an expert appraiser of real estate. After the death of the intestate, he approached Mrs. Hulsey and told her he had a buyer for the filling station lot at $85,000. See, United States v. Dillman (C.C.A.Tex.1944) 146 F.2d 572, 575. It developed during his examination, though, that he was not in a position to make a firm offer; what he sought was an option to sell at $85,000. He had a prospect, who, he said, was interested. At first, he demurred at naming the prospect, fearing, as he explained it, that some other real estate salesman might attempt to approach his prospect. This testimony confirmed the impression that Mr. Bagwell really had no firm buyer; he was seeking an option in the hope that he might induce his prospect to exercise it. The situation

thus presented is very similar to that in the *Holly Hill Lumber Company Case,* *supra.* In that case, the purchase price provided in the option for the land in question was $3,500. In the meantime, an offer of $25,000 was submitted. The Court dismissed this offer, remarking, "In the light of all of the evidence, it would be most reasonable to infer that this offer is based upon speculation, which is not favored in equity." (201 S.C. at page 445, 23 S.E.2d at page 380.) Even more than in the cited case, Mr. Bagwell's request for an option was a speculation, to which little or no weight can be given. In addition, options to sell, such as Mr. Bagwell sought, are admissible against the owner but not, as in this case, in favor of the owner, as evidence of value. 27 Am.Jur.2d, sec. 428, pp. 330–1; 31A C.J.S. § 183(3), p. 485.

Over against this testimony of the defendants, the plaintiff relies on the testimony of Mr. Bryant Owens, a real estate appraiser, who, using much the same sales and rentals, found the value of the filling station site to be $45,000. Mr. Riggs, who is not without some competency in fixing values of real estate in Clarendon County, regarded a valuation for the filling station site at $40,000 as not unreasonable. Moreover, Mr. Harvin and the intestate, after making their own independent investigation, fastened on a valuation of $40,000. The strongest and most reliable evidence of value, however, was supplied by the actions of Sinclair and Gulf. Sinclair, offered the property, concluded it was not worth a monthly rental of $200; and Gulf fixed its value of the property at $44,000. These represented valuations made by parties interested in the site and with recognized expertise in valuing such a site.

Weighing all the evidence and giving proper consideration to the interests and qualifications of the several witnesses on valuations, I find that the reasonable value of the filling station site, as of the date of the lease option, was between $40,000 and $45,000 and a reasonable rental from $200 to $250 per month. It is plain that such valuation, differing so slightly from that made by the plaintiff, Mr. Harvin and the intestate, is not so gross or disproportionate to permit the denial of relief to the plaintiff. Nor are there any accompanying "inequitable incidents" in this case. Unlike the situation in Gasque v. Small, *supra* (2 Strob. Eq. 72), the intestate was not pressed into the execution of these options without an opportunity to seek advice and counsel. In fact, the plaintiff made no effort to secure an immediate decision from the intestate on February 22. It left the option leases with the intestate's real estate agent in order that the intestate might review them should he so desire. Mr. Riddle actually recommended to the intestate that he consult, and the intestate did consult, his own lawyer. There was clearly no attempt in over-reaching. Unlike the facts in Page v. Lewis (1946) 209 S.C. 212, 223, 39 S.E.2d 787,[7] the defendants do not suggest that Mr. Riddle, in his discussions with the intestate, made any misrepresentation as to the lease for the filling station site. The record shows, on the contrary, that Mr. Riddle sought as clearly as he knew how to explain to the intestate the full implications of the lease for the filling station site. There was no imposition, there was no over-reaching, there were no misrepresentations, there was no denial of a right to consult others, in this case.

■ To sum it up, there is not such inadequacy of consideration as will warrant denial of relief to the plaintiff in connection with the filling station lot.

7. In this case, the Court found "that what he (the grantor) did was superinduced by fraudulent representations." Moreover, again unlike this case, the deed was voluntary. That a voluntary transfer is more vulnerable than one based on consideration, see, 209 S.C. at p. 242, 39 S.E.2d 787 at p. 791; Zeigler v. Shuler (1910) 87 S.C. 1, 4–5, 68 S.E. 817; Devlin v. Devlin (1911) 89 S.C. 268, 270–271, 71 S.E. 966.

## IV

The defendants assert that the lease options should be denied enforcement because of hardship. This plea is directed wholly at the lease option relating to the sign site and its connecting tongue. The defendants insist that a lease of the fee as provided in the area, 10′ x 1000′, running from the filling station site to the sign site, rather than merely an easement limited in extent to the installation and maintenance of an underground electric line to service the sign itself, seriously impairs the use of the defendants' remaining property. Under the lease option as now written, the plaintiff could, they contend, erect any kind of structure it wished along this line, obstructing the visibility of their property behind such line and reducing its value as a motel or trucking site.

It seems unlikely that the plaintiff would want to use this extension line for any purpose other than the servicing of its sign. It must, however, be conceded that it would have such right under the lease as written.

Actually, it seems that at the conference on February 22, the construction given by the parties to this lease option was in the nature of an easement right rather than a lease of the fee. This construction represented, I am convinced, the understanding of the parties. So construed, the lease option would accord with the plain understanding of the parties and it would remove the hardship, of which the defendants complain.

 This cause is in equity and the Court has power to do equity between the parties. Included in such powers is that of reforming the lease option connected with the sign site to conform to the understanding of the parties. Martin v. LaBoon (1921) 116 S.C. 97, 108–109, 107 S.E. 320; Bradford v. Union Bank of Tennessee (1851) 13 How. 57, 66, 54 U.S. 57, 14 L.Ed. 49; McFarland v. Gregory (C.C.A.N.Y.1963) 322 F.2d 737, 739; Annotation, 66 A.L.R. 780–1; Martin v. Oakhurst Development Corporation (1944) 197 Ga. 288, 29 S.E.2d 179, 183. If the plaintiff formally moves, on the record as made herein, to reform the lease option relating to the lane leading to the sign site, such motion will be granted and the plaintiff will be granted specific performance of this lease, so reformed. Absent such motion to reform, entered within 15 days after the entry hereof, specific performance of the lease option covering the sign site and the strip leading from the filling station site to the sign site will be denied. This conclusion will remove the hardship which the defendants urge would result from the enforcement of the said lease option as written.

 The claim of hardship (apart from claims relating to inadequacy of consideration, already disposed of) is not directed at the lease option applicable to the filling station site. Since the two lease options are represented in two separate and independent contracts, any claims of hardship or unfairness in the sign site does not infect the lease option for the filling station site.

## V

The defendants predicate their most insistent objection to specific performance on what they assert is a want of mutuality of remedies in the lease options. It is conceded the lease options, executed as they were by the lessor for a cash consideration, give the lessee the option, on 30 days' written notice, to terminate the leases by the payment of a full year's rental; no similar right is conferred by the leases on the lessor. The defendants contend that this absence of identity of rights to terminate on the part of both lessor and lessee renders the options to lease unenforceable in specific performance. In fact, they do not content themselves with the argument that this provision of the leases precludes the plaintiff from exercising the equitable remedy of specific performance; anticipating that, if they prevail in this proceeding, they invite an action at law for damages, they, in their proposed Conclusions of Law, seek to have this Court

rule in this proceeding that the plaintiff, in any such action for damages for breach of the leases, by the same principle of mutuality, is restricted in its recovery to a year's rental under the leases.[8] In sum, mutuality, under defendants' argument, means that each party's remedies are precisely the same, whether at law or in equity, and irrespective of the terms of the contract.

There is no authoritative decision of South Carolina on mutuality of remedy as a condition to granting specific performance. In the opinion of the Circuit Court, affirmed on appeal in Columbia Water Power Company v. City of Columbia (1873) 5 S.C. 225, 232, cited by defendants, the Circuit Court stated if "there was an original want of mutuality in the contract", this defense "might be important". The use of the phrase "original want of mutuality" indicates plainly the Court was considering mutuality in terms of consideration at the inception of the contract, of a promise for a promise, and not in terms of mutuality of remedy.

It is, however, a legal cliche in many of the decisions that want of mutuality of remedy bars the right of specific performance. But, as a limitation upon the exercise of such right, it has been so restricted in application as to be valueless. Mr. Justice Cardozo aptly observed in his oft-cited opinion in Epstein v. Gluckin (1922) 233 N.Y. 490, 135 N.E. 861, 862, that, the rule, criticized as it has been without reserve by text writers and legal scholars,[9] "has been so qualified by exceptions that, viewed as a precept of general validity, it has ceased to be a rule to-day." Clearly, as the Court remarked in Morad v. Silva (1954) 331 Mass. 94, 117 N.E.2d 290, 292–293, "the great weight of modern authority has repudiated it." This conclusion is amply supported by recent decisions. Leighton v. Leighton (1968) 10 Mich. App. 424, 159 N.W.2d 750, 756; Great Lakes & St. L. T. Co. v. Scranton Coal Co. (C.C.A.Ill.1917) 239 F. 603, 609;

8. This argument rests on the premise that if a contract gives one party the right to terminate at will, the same privilege will be extended to the other party. Cf., State ex rel. Anderson v. Brand (1937) 214 Ind. 347, 5 N.E.2d 531, 913, 7 N.E. 2d 777, 779, 13 N.E.2d 955, 110 A.L.R. 778, rev. on other grounds 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685, 113 A.L.R. 1482; and Gantt v. Southern Railway Co. (1923) 125 S.C. 518, 524, 118 S.E. 920. Such rule is generally invoked in employment contract cases, but it proceeds on the theory of want of consideration, the lack of a promise for a promise. Annotation, 7 A.L.R.3d 898. In other words, if one of the parties gives a promise to employ but the other is under no obligation to work except as he chooses, there is a want of consideration for the promise of the former. That the issue is one purely of consideration, see Weber v. Perry (1942) 201 S.C. 8, 12, 21 S.E.2d 193; Gainey v. Coker's Pedigreed Seed Co. (1955) 227 S.C. 200, 205, 87 S.E.2d 486; and Witte v. Brasington (D.C.S.C.1952) 125 F.Supp. 784, 786. For the reasons given later, there is no warrant for the application of such principle in this case. There were promises on both sides and there was consideration. Ours is not a case in which the lessee might terminate at will and without liability.

9. 5A, Corbin on Contracts, sec. 1180 et seq.; 11 Williston on Contracts (3rd ed.), 884, sec. 1433:
"While this 'rule' had some significance some few decades ago, it has been generally repudiated, especially as the exceptions gradually swallowed it."
See, also, Durfee, Mutuality in Specific Performance, 20 Mich.L.Rev. 289; Walsh, Mutuality of Remedy in the Federal Courts, 36 Geo.L.J. 220; Cook, The Present Status of the "Lack of Mutuality" Rule, 36 Yale L.J. 897; Stone, The Mutuality Rule in New York, 16 Colum.L. Rev. 443; Ames, Mutuality in Specific Peformance, 3 Colum.L.Rev. 1.
Cf., Javierre v. Central Altagracia (1910) 217 U.S. 502, 508, 30 S.Ct. 598, 600, 54 L.Ed. 859: "There is too a want of mutuality in the remedy, *whatever that objection may amount to* * * *." (Italics added.)
See, also, 11 Williston, p. 886:
" * * * the so-called 'rule of mutuality of remedy' has gradually fallen into an innocuous desuetude, is in conflict with numerous decisions, and its broader statements and implications have been gradually discredited."

American Oil Company v. Carey (E.D. Mich.1965) 246 F.Supp. 773, 774–775; Sweet Music, Inc. v. Melrose Music Corp. (D.C.Cal.1960) 189 F.Supp. 665, 658; Urbain v. Speak (1966) 258 Iowa 584, 139 N.W.2d 311, 314; Messina v. Moeller (1957) 214 Md. 110, 133 A.2d 75, 76–77; Rice v. Griffith (1942) 349 Mo. 373, 161 S.W.2d 220, 225; Gould v. Stelter (1958) 14 Ill.2d 376, 152 N.E. 2d 869, 871–872; Cooley v. Stevens (1961) 240 Miss. 581, 128 So.2d 124; Paullus v. Yarbrough (1959) 219 Or. 611, 347 P.2d 620, 636, 79 A.L.R.2d 1222; and Tombari v. Griepp (1960) 55 Wash. 2d 771, 350 P.2d 452, 455.

In the law of contracts, mutuality, both in definition and in application, is largely synonymous with consideration. Bodcaw Oil Co. v. Atlantic Refining Co. (1950) 217 Ark. 50, 228 S.W.2d 626; C. G. Blake Co. v. W. R. Smith & Son (1926) 147 Va. 960, 133 S.E. 685, 688; Ash v. Chas. F. Noble Oil & Gas Co. (1923) 96 Okl. 211, 223 P. 175, 179.[10] It demands that there be obligations assumed by both parties, that there be a promise for a promise. But, as the Court phrased it in Philadelphia Ball Club v. Lajoie (1902) 202 Pa. 210, 51 A. 973, 975, 58 L.R.A. 227:

"We cannot agree that mutuality of remedy requires that each party should have precisely the same remedy, either in form, effect, or extent."

Again, in Thompson v. Shell Petroleum Corporation (1938) 130 Fla. 652, 178 So. 413, 417, 117 A.L.R. 248, 253, the Court said:

" 'The legal principle that contracts must be mutual does not mean that in every case each party must have the same remedy for a breach as the other. Mere difference in the right stipulated for does not destroy mutuality of remedy, as the contract covers a wide range of obligations and duties as between the parties, and it may not be impaired so long as the bonds of reasonableness and fairness are not transgressed.' "

In Rice v. Griffith (1942) 349 Mo. 373, 161 S.W.2d 220, 225, it was said that "it does not follow that the doctrine of mutuality requires specific performance to be obtainable alike by both parties to the agreement."

In McGurren v. City of Fargo (N.D. 1954) 66 N.W.2d 207, 210, it was stated: "Mutuality, however, does not require that the parties have the same remedies against each other."

As Corbin remarked, in discussing this rule of mutuality as applied to actions in specific performance, justice does not require "that the law shall in each instance afford them (the parties) identical remedies." Vol. 5A, p. 327.

It follows that if there is an obligation on both parties to the contract, there is mutuality. It matters not that the remedy on one side is different from that given the other; it is sufficient that there is a remedy, a right, on both sides. Corbin, *supra.* Of course, if the defendant has the right to terminate the contract immediately without liability, the contract will not be specifically enforced.[11] There are two reasons. First, if one party is bound to perform and the other not, and the consideration consists merely of mutual promises, it may be said that the contract is a *nudum pactum.* Miami Coca-Cola Bottling Co. v. Orange Crush Co. (C.C.A.Fla.1924) 296 F. 693, 694; Naylor v. Parker (Tex.Civ. App.1911) 139 S.W. 93, 97–98; Weber v. Perry, *supra* (201 S.C. 8, 12, 12 S.E.2d

10. There, of course, are situations where there may be consideration, though not mutuality of obligation. Cf., Lewis v. Minnesota Mut. Life Ins. Co. (1949) 240 Iowa 1249, 37 N.W.2d 316, 324, where a promissory note for consideration is instanced as involving consideration but not mutuality.

11. Lyon v. Goss (Cal.App.1941) 115 P.2d 886, 889:
"A contract which can be terminated at the will of one of the parties without liability for damages," lacks mutuality.
See, also, United Distillers Agency v. Old Rock Distilling Co. (D.C.Mo.1942) 3 F.R.D. 179, 180.

193); Town of Vinton v. City of Roanoke (1954) 195 Va. 881, 80 S.E.2d 608, 617.[12] Moreover, it is a familiar maxim of equity that "equity will not do a vain thing." Ury v. Watterson (1894) 5 Ohio Cir.Ct.R. 347, aff. 52 Ohio St. 637, 44 N.E. 1149. If the contract gives the defendant the right to terminate at will without liability, then at any time—at the time of the filing of the action or the entry of the decree—the defendant could nullify without liability any decree of the Court. Thus, in Reichert v. Pure Oil Co. (1925) 164 Minn. 252, 204 N.W. 882, 884, the Court said:

> "The rule that a court of equity will not decree performance of a contract at the instance of a plaintiff who has the power to terminate it at will is not based on the ground that the contract is invalid for lack of consideration or want of mutuality of obligation; but on the ground that the court will not decree performance unless it can compel performance by both parties, and it cannot compel performance by the plaintiff as he could avoid the decree at any time by revoking the contract."

But, where the right to terminate by the plaintiff is only after notice and with penalty, there is not such want of mutuality as will destroy the right to specific performance, regardless of whether a right to terminate is vested in the defendant. 3 Williston on Contracts, sec. 2567 (now sec. 1442, Rev.ed.) makes this plain with the following comment:

> "Equity will not enforce a contract specifically which the defendant has a right under the contract to terminate immediately, as a contract to enter into a partnership, or lease, terminable at the will of the defendant. Partly from confusion with this principle, partly for alleged lack of mutuality, specific performance has been refused in a number of cases because

the plaintiff had a power given him under the contract to terminate it after a given time or on giving a certain notice, or on paying a trifling sum of money, and no such power was given the defendant. There seems no foundation for any such broad rule. Doubtless such a contract may be so harsh or one-sided that equity should decline to enforce it, and this explains some of the decisions; but the mere fact that one party to a contract is given a right which the other is not is no reason for refusing equitable relief."

To the same effect is Alfson v. Anderson (N.D.1956) 78 N.W.2d 693, 703, where the Court said:

> "We can see reason for the rule that a contract to make a lease which can be terminated forthwith without obligation on the part of the lessee lacks mutuality of obligation and remedy because the decree of the court should be set to nought by a termination of the lease on the part of the lessee if specific performance were decreed against him. But where, as in this case, the contract binds the prospective lessee to pay a substantial sum on execution and delivery of the lease irrespective of the right of termination, the contract does not lack mutuality of either obligation or remedy and the court may specifically enforce execution of the lease by the lessor and payment by the lessee or either."

Thompson v. Shell Petroleum Corp., supra (130 Fla. 652, 178 So. 413) aptly illustrates the correct application of the foregoing principles. There, the lease, specific performance of which was sought, provided for a right in the lessee to terminate the lease on 15 days' notice and payment of $100. It was held that the relief of specific performance (in the form of a negative injunction) would not be denied on account of lack of mutuality, the Court remarking that,

---

12. This is made clear by the comment of the Court in Miami Coca-Cola Bottling Co. v. Orange Crush Co., *supra*, that (296 F. at p. 694): "The consideration was a promise for a promise. But the appellant did not promise to do anything, and could at any time cancel the contract" without liability.

" 'The legal principle that contracts must be mutual does not mean that in every case each party must have the same remedy for a breach as the other. * * *' " 178 So. at p. 417, 117 A.L.R. at p. 253.

Again, in Daniels v. Brown Shoe Co. (C.C.A.Mass.1935) 77 F.2d 899, which was a suit to enforce specifically a patent license agreement, the agreement was terminable by the licensor at any time on six months' written notice. In upholding the right to specific enforcement, the Court said (p. 901):

> "The contention is that such a contract would not be specifically enforced against the licensor, as he could avoid the decree by terminating the contract, and that therefore it will not be specifically enforced against the licensee. Rutland Marble Co. v. Ripley, 10 Wall. 339, 359, 19 L.Ed. 955, is cited in support of this contention. Commenting on this decision Judge John Lowell said: 'I cannot think that the court intended to announce any general proposition that they would never enforce a contract which one party had a right to put an end to in a year. Every thing must depend upon the nature and circumstances of the business.' Singer Sewing Machine Co. v. Union Buttonhole [& Embroidery] Co., 22 Fed.Cas. 220, 223, No. 12,904. The expressions on this point in the opinion in the Rutland Marble Co. Case have been questioned in Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856, and by text-writers. See 16 Col.Law Rev. 443, by Mr. Justice Stone, then Dean of the Columbia Law School. We think that the correct rule is that stated in Epstein v. Gluckin, 233 N.Y. 490, 135 N.E. 861. What 'equity exacts to-day as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to plaintiff or to defendant.' Cardozo, J., 233 N.Y. at page 494, 135 N.E. 861, 862. There is no difficulty of that sort in the present case. Cases in which the defendant had a right to cancel the

contract stand of course on a very different footing."

Guffey v. Smith, supra (237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856) at least by implication, supports the position of the plaintiff that, in this case, specific performance is not to be denied because of want of mutuality. In that case, the Court held the action was "to protect a present vested leasehold" based upon a lease of certain oil properties and not for technical specific performance of the lease, though the practical effect was the same. The defendant contended effect should not be given to the leases because the complainants had "a reserved option to surrender the lease at any time, * * *." The Court, in dismissing the objection, said (p. 115, 35 S.Ct. at p. 530):

> "The rule intended to be invoked has to do with the specific performance of executory contracts, is restrained by many exceptions, and has been the subject of divergent opinions on the part of jurists and text-writers."

Defendants have cited 19 Hastings Law J. 1430 (1968), "Mutuality of Remedies in California under Civil Code Section 3386" as supporting their views. California is one of those States which by statute has provided that each party to an action for specific performance must have "everything to which the former (the plaintiff in the action) is entitled under the same obligation". Such a statute, the enactment of which is criticized in 47 Har.L.Rev. (1936), at p. 1039, "has helped in leading the courts of that State to deny specific performance in many cases where the general rule is otherwise." 36 Yale L.J. 897 at p. 911. But the writer in the Hastings Law Journal after referring to the ruling by the California courts under the statute that, if one of the parties to a contract may terminate after notice, such contract will not be specifically enforced, concludes that such result "is an unreasonable one". I agree: The result is "an unreasonable one", which, as repeated modern

decisions attest, has been generally repudiated, and, in the absence of any controlling South Carolina authority this Court cannot approve.

It accordingly follows that in this case, where the right to terminate in favor of the plaintiff is not at will and without liability, there is not such want of mutuality as to deny to the plaintiff its right to the specific performance of its lease options.

## VI

Finally, the defendants claim vagueness in the lease because the lessee is given the right to level off the sides of its leased lot. The defendants did not seriously argue this point and it seems too inconsequential to merit attention.

To summarize:

The plaintiff is entitled to the specific performance of its lease of the filling station site. Should it seek reformation herein of its lease of the sign site as outlined above, plaintiff may have specific performance of such lease as reformed; otherwise, specific performance of the lease of the sign site will be denied.

And it is so ordered.

The foregoing shall constitute Findings of Fact and Conclusions of Law in compliance with Rule 52(a), Rules of Civil Procedure (28 U.S.C.A.).